SOUTH ET AL. *v.* PETERS, CHAIRMAN OF THE GEORGIA STATE DEMOCRATIC EXECUTIVE COMMITTEE, ET AL.

No. 724.   Decided April 17, 1950.

*Hamilton Douglas, Jr.* for appellants.

*Eugene Cook,* Attorney General of Georgia, *M. H. Blackshear,* Assistant Attorney General, *M. F. Goldstein* and *B. D. Murphy* for appellees.

PER CURIAM.

The Georgia statute which appellants attack as violative of the Fourteenth and Seventeenth Amendments provides that county unit votes shall determine the outcome of a primary election.[1]  Each county is allotted a

---

[1] Ga. Code Ann. §§ 34–3212 *et seq.* (1936).  Although this particular statute was enacted in 1917, the county unit has been basic in the state electoral scheme since Georgia's first constitution in 1777.

number of unit votes, ranging from six for the eight most populous counties, to two for most of the counties. The candidate who receives the highest popular vote in the county is awarded the appropriate number of unit votes. Appellants, residents of the most populous county in the State, contend that their votes and those of all other voters in that county have on the average but one-tenth the weight of those in the other counties. Urging that this amounts to an unconstitutional discrimination against them, appellants brought this suit to restrain adherence to the statute in the forthcoming Democratic Party primary for United States Senator, Governor and other state offices.

The court below dismissed appellants' petition. 89 F. Supp. 672. We affirm. Federal courts consistently refuse to exercise their equity powers in cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions. See *MacDougall* v. *Green,* 335 U. S. 281 (1948); *Colegrove* v. *Green,* 328 U. S. 549 (1946); *Wood* v. *Broom,* 287 U. S. 1, 8 (1932); cf. *Johnson* v. *Stevenson,* 170 F. 2d 108 (C. A. 5th Cir., 1948).

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I suppose that if a State reduced the vote of Negroes, Catholics, or Jews so that each got only one-tenth of a vote, we would strike the law down. The right to vote in a primary was held in *Nixon* v. *Herndon,* 273 U. S. 536, to be covered by the Equal Protection Clause of the Fourteenth Amendment. And where, as in Georgia, a party primary election is an integral part of the state election machinery, the right to vote in it is protected by the Fifteenth Amendment. *Smith* v. *Allwright,* 321 U. S. 649. And see *United States* v. *Classic,* 313 U. S.

299. Under both Amendments discriminations based on race, creed or color fall beyond the pale.

Yet there is evidence in this case showing that Georgia's County Unit System of consolidating votes in primary elections makes an equally invidious discrimination. Under this primary law the nomination does not go to the candidate who gets the majority or plurality of votes. Votes are counted county by county. The winner in each county gets a designated number of votes—six in the most populous counties, four in the next most populous, two in each of the rest.

Plaintiffs are registered voters in Georgia's most populous county—Fulton County. They complain that their votes will be counted so as drastically to reduce their voting strength.

They show that a vote in one county will be worth over 120 times each of their votes. They show that in 45 counties a vote will be given twenty times the weight of each of theirs. They show that on a state-wide average each vote outside Fulton County will have over 11 times the weight of each vote of the plaintiffs.

Population figures show that there is a heavy Negro population in the large cities. There is testimony in the record that only in those areas have Negroes been able to vote in important numbers. Yet the County Unit System heavily disenfranchises that urban Negro population. The County Unit System has indeed been called the "last loophole" around our decisions holding that there must be no discrimination because of race in primary as well as in general elections.

The racial angle of the case only emphasizes the bite of the decision which sustains the County Unit System of voting. The discrimination against citizens in the more populous counties of Georgia is plain. Because they are city folks their voting power is only an eleventh or a hundred and twentieth of the voting power of other

citizens. I can see no way to save that classification under the Equal Protection Clause. The creation by law of favored groups of citizens and the grant to them of preferred political rights is the worst of all discriminations under a democratic system of government.

The County Unit System has other constitutional infirmities. Article I, § 2 of the Constitution provides that members of the House of Representatives shall be "chosen" by the people. And the Seventeenth Amendment provides that Senators shall be "elected by the people." These constitutional rights extend to the primary where that election is an integral part of the procedure of choosing Representatives or Senators, or where in fact the primary effectively controls the choice. *United States* v. *Classic, supra.* In Georgia's primary to be held on June 28, 1950, a United States Senator will be nominated. Certainly in a State like Georgia, where the Democratic nomination is equivalent to election, it would be a travesty to say that the true election in the constitutional sense comes later.

There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted. *United States* v. *Classic, supra; Ex parte Yarbrough,* 110 U. S. 651. It also includes the right to have the vote counted at full value without dilution or discount. *United States* v. *Saylor,* 322 U. S. 385. That federally protected right suffers substantial dilution in this case. The favored group has full voting strength. The groups not in favor have their votes discounted.

In *Colegrove* v. *Green,* 328 U. S. 549, we had before us a case involving the division of Illinois into congressional districts in such a way that gross inequalities in voting resulted. Citizens of heavily populated districts sued to enjoin state officials from holding an election under the

Illinois law governing congressional districts. There was an argument, persuasive to three members of the Court, that the issue presented was of a political nature and not justiciable, that it was an effort to get the federal courts "to reconstruct the electoral process of Illinois in order that it may be adequately represented in the councils of the Nation." 328 U. S. 552. And in *MacDougall* v. *Green,* 335 U. S. 281, the Court on a closely divided vote refused to interfere with the provisions of the Illinois law governing the formation of a new political party. There is no such force in the argument that the question in the present case is political and not justiciable.

Plaintiffs sue as individuals to enforce rights political in origin and relating to political action. But as Mr. Justice Holmes said of the same argument in *Nixon* v. *Herndon, supra,* p. 540, it is "little more than a play upon words" to call it a political suit and therefore a nonjusticiable one. The rights they seek to enforce are personal and individual. Moreover, no decree which we need enter would collide either with Congress or with the election. Georgia need not be remapped politically. The Georgia legislature need not take new action after our decree. There is no necessity that we supervise an election. There need be no change or alteration in the place of the election, its time, the ballots that are used, or the regulations that govern its conduct. The wrong done by the County Unit System takes place not only after the ballots are in the box but also after they have been counted. The impact of the decree would be on the tallying of votes and the determination of what names go on the general election ballot. The interference with the political processes of the state is no greater here than it is when ballot boxes are stuffed or other tampering with the votes occurs and we take action to correct the practice. And related considerations, which led Mr. Justice Rutledge to conclude in *Colegrove* v. *Green* that the Court

should not exercise its equity powers in that election, are lacking here. There is time to act, since the state primary is called for June 28, 1950. Relief can be certain. No conflict with any policy of Congress is possible. There is no overhauling of the State's electoral process.

The case is of greater importance than the rights of plaintiffs in this next election may appear to be. We have here a system of discrimination in primary voting that undermines the advances made by the *Nixon, Classic,* and *Allwright* cases. Those decisions are defeated by a device as deeply rooted in discrimination as the practice which keeps a man from the voting booth because of his race, creed or color, or which fails to count his vote after it has been cast.

It is said that the dilution of plaintiffs' votes in the present case is justified because equality of voting is unnecessary in the nomination of United States Senators. Thus it is pointed out that in some states nomination is by conventions. But that proves too much. If that premise is allowed, then the whole ground is cut from under our primary cases since *Nixon* v. *Herndon,* which have insisted that where there is voting there be equality. Indeed the only tenable premise under the Fourteenth, Fifteenth and Seventeenth Amendments is that where nominations are made in primary elections, there shall be no inequality in voting power by reason of race, creed, color or other invidious discrimination.