James A. RADFORD, Plaintiff,

v.

Raymond GARY, Governor of the State of Oklahoma; The House of Representatives of the State of Oklahoma; The State Senate of the State of Oklahoma: N. B. Johnson, Earl Welch, Albert C. Hunt, N. S. Corn, Ben T. Williams, Harry L. S. Halley, W. H. Blackbird, Denver Davison and Floyd L. Jackson, Composing the Supreme Court of the State of Oklahoma; and George D. Key, Art S. Bower, and Leo Winters, constituting the State Election Board of the State of Oklahoma, Defendants.

Civ. No. 7144.

United States District Court
W. D. Oklahoma.

Nov. 2, 1956.

———◆———

Sid White, Oklahoma City, Okl., for plaintiff.

Mac Q. Williamson, Atty. Gen., of Oklahoma, and Fred Hansen, First Asst. Atty. Gen., for defendants.

Before MURRAH, Circuit Judge, and WALLACE and RIZLEY, District Judges.

MURRAH, Circuit Judge.

This three-judge court was convened under Title 28 U.S.C.A. § 2281, to hear

the complaint of the plaintiff to the effect that the existing apportionment statutes of the State of Oklahoma violate the plain mandate of the Oklahoma Constitution and operate to deprive him of the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States.

The essential allegations are that the complainant is a citizen of Oklahoma and resident and voter in the most populous county in the State; that because of a shift in the population since 1910, the county wherein the complainant resides and votes, now has approximately fifteen percent of the total population of the State, with approximately two percent representation in the State Senate and less than four percent in the House of Representatives; that since 1910, the Legislature of the State of Oklahoma has failed to reapportion the State as required by Article V, Sections 9(a) and 10 of the Oklahoma Constitution; that the defendant, Governor of the State, has failed and refused to call a special session of the Legislature for the purpose of effecting legislative compliance with the constitutional mandate; that the Supreme Court of the State of Oklahoma has repeatedly failed and refused to require compliance with the Constitution; and that the complainant is therefore without state remedy.

The prayer is for a writ of mandamus to the Governor to call the Legislature into session for remedial legislation, and when so called, the Legislature be commanded by this court to make apportionments required by the Oklahoma Constitution and equal protection clauses of the Federal Constitution; and that failing to do so, the individual members of the Supreme Court of the State of Oklahoma be commanded by mandamus or mandatory injunction to make the apportionment as by law required. Meanwhile, the court is asked to restrain and enjoin the individual members of the State Election Board from holding any election to elect members of the House of Representatives or the State Senate of the State of Oklahoma by presently constituted districts; that until constitutional reapportionment is effected, the members of the House of Representatives and the Senate be elected at large. In the event of the election and certification of representatives and senators from the existing districts, we are asked to enjoin the State Auditor and the State Treasurer from paying the per diem, salaries and expenses from appropriations made by the so-called de facto Legislature.

█ This being a civil action to redress the deprivation, under color of state law, a right secured by the Constitution of the United States; and since injunctive relief is sought against the operation of a state statute by state officers, all of the elements of three-judge jurisdiction are present. See 28 U.S.C.A. §§ 1343(3) and 2284.

█ The case comes on for consideration on the defendants' motion to dismiss, by which they admit all of the essential allegations of the complaint. And, the issues are further sharpened by the Attorney General's candid admission that the Oklahoma Legislature has, since 1910 failed and refused to reapportion the State of Oklahoma in compliance with the plain mandate of the Constitution of the State of Oklahoma.

On at least three occasions, the question of reapportionment has been before the Supreme Court of the State of Oklahoma. In each case, the court has declared the right of each citizen "to have the state apportioned in accordance with the provisions of the Constitution, and to be governed by a Legislature which fairly represents the whole body of the electorate, elected as required by the provisions of the Constitution." Jones v. Freeman, 193 Okl. 554, 146 P.2d 564, 571; and see Latting v. Cordell, 197 Okl. 369, 172 P.2d 397; Romang v. Cordell, 206 Okl. 369, 243 P.2d 677. And, in each instance, the Oklahoma Court has said emphatically that the existing reapportionment statutes have failed to comply with the requirements of the Constitution. The question in each case was not

whether the Supreme Court had jurisdiction to review legislative reapportionment acts upon constitutional grounds, but whether it was constitutionally empowered to "revise or correct" the apportionment when the Legislature refused to act. In each case the Oklahoma court declined to grant any relief on the grounds that the mandate of the Constitution was addressed solely to the Legislature. And, in the event of the failure of the Legislature to act, the remedy was in the hands of the sovereign people who may (1) elect legislators who will comply with the Constitution or prescribe rules and regulations whereby the Supreme Court may do so; (2) initiate a proper statute; or (3) amend the Constitution to take the power of apportionment from the Legislature and vest it in a ministerial board subject to the coercive power of the court. See Romang v. Cordell, supra, 243 P.2d at page 681.

This concept of the separation of powers finds ready support in the federal cases where the federal Constitution has been invoked to require state action. The first of the contemporary cases, Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, involved the complaint of voters in a populous congressional district in the State of Illinois. It was alleged that the failure of the Legislature of the State of Illinois to redistrict the State in accordance with the Reapportionment Act of August 8, 1911, 37 Stat. 13, as amended, 2 U.S.C.A. § 2a, operated to deprive the complaining voters of the rights and privileges secured to them by the Constitution and laws of the United States. Particularly it was alleged that changes in population in the congressional districts since the State Reapportionment Act of 1901, S.H.A. ch. 46, §§ 154–156, had diluted the voters' rights in the populous districts to the point of deprivation of their constitutionally guaranteed equality of suffrage. On authority of Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131, the Supreme Court affirmed the dismissal of the complaint on the grounds that the Illinois Act of 1901 did not violate the Federal Reapportionment Act of June 18, 1929, 46 Stat. 21.

But the court was not content to rest its decision on the question of state compliance with federal law. The majority went on to explore the broader question of the competence of the federal courts to grant relief, even in the face of a deprivation of a federally protected suffrage right, finally concluding that the issue was one of a "peculiarly political nature and therefore not meet for judicial determination." See Colegrove v. Green, supra, 328 U.S. at page 552, 66 S.Ct. at page 1199. The court took the view that the Federal Constitution, Art. 1, § 4, had "conferred upon Congress exclusive authority to secure fair representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility." And, said the court, "If Congress failed in exercising its powers, whereby standards of fairness are offended, the remedy ultimately lies with the people." Id., 328 U.S. at page 554, 66 S.Ct. at page 1200. The issue was thus committed to the "exclusive control of Congress."

There was a strong dissent, not only in support of federal jurisdiction, but the propriety of its exercise in order to redress what was deemed a flagrant deprivation of a right secured to the complainants by the Federal Constitution. The dissenters thought that the failure to equitably apportion the congressional districts, thus diluting the weight and influence of the citizen's vote, was quite as much a deprivation of his constitutional right as the right to vote and have it counted, which was ardently vouchsafed in Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987.

But the majority view again prevailed in the closely analogous case of Mac-Dougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, wherein an injunction was sought against a statute which allegedly discriminated against the most populous counties in the State of Illinois in its provisions for the formation and recognition of a new political party in that State.

And, the majority view was again upheld in a case more similar to ours in which the complaint challenged the validity of Georgia's County Unit Election system. As against the contention of the complaining residents of the most populous counties in the State that the "voters in that county have an average of about one-tenth of the weight of those in other counties" amounting to an unconstitutional discrimination, the court declined any equitable relief on the grounds that the case posed only state "political issues" with which the federal courts should not interfere. See South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, citing MacDougall v. Green, supra, and Colegrove v. Green, supra.

Constrained by these authoritative decisions, a three-judge court refused to exercise equity jurisdiction in a suit by voters in Pennsylvania which challenged the reapportionment statutes of that State on the grounds that they had the practical effect of substantially disfranchising the complaining qualified voters. Remmey v. Smith, D.C., 102 F.Supp. 708. The court reasoned that if the federal courts should not intervene where national representation was involved, a fortiori it should not intervene where, as there and here, only state representation was involved. While the court made a point of the unexhausted remedies in the state courts, and observed that the general assembly of the Commonwealth then in session might yet afford a remedy, it was nevertheless careful not to tread on the political ground which the Supreme Court had so unequivocally set apart as legislative domain.

The complainant relies heavily on Dyer v. Kazuhisa Abe, D.C., 138 F.Supp. 220, where the federal court in the Territory of Hawaii granted appropriate relief against discriminatory election laws of the Territory. But that court was careful to point out the fundamental distinction between the questions posed in Colegrove v. Green, supra, and the problem there, saying, "The Territory of Hawaii does not have the same relation to this Court that the State of Illinois has to a federal court within its boundaries." 138 F.Supp. at page 234. In any event, we are unable to distinguish our facts from those involved in the Colegrove and MacDougall cases.

Finally, we are asked to reappraise Colegrove and its successors in the light of the philosophy of the recent civil rights cases, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Id., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L. Ed. 884, wherein the Supreme Court is said to have adopted an entirely different concept of the transcendent effect of the equal protection clauses of the Fourteenth Amendment as applied to state political and social policies. There is nothing in the so-called civil rights cases indicating a disposition to reverse, modify or repudiate the rule so firmly established in the former cases, and it is not the function of this Court to psychoanalyze the justices of the Supreme Court in order to divine the trend of decisions. It is sufficient that the Supreme Court has authoritatively spoken on the question before us, and we are bound until it speaks again.

The motion to dismiss is sustained and the action is dismissed.

RIZLEY, District Judge, concurs.

WALLACE, District Judge (dissenting).

Historically, all courts have been reluctant to call upon judicial remedies to treat ailments properly allocable to the executive or legislative branches of government. And, the federal judiciary, in

addition to holding in high regard the separation of powers, has been peculiarly aware of the coexistence of local and national law, and the need to carefully avoid unnecessary clashes between the two. Yet pursuant to the evolution of our law where it has become apparent that federal constitutional rights have been violated at the local level and only the federal judiciary stands in a position to safeguard such rights, federal intervention takes place even at the risk of local disapproval.[1]

Unquestionably, the inaction of the Oklahoma Legislature has resulted in denying the plaintiff, and others similarly located, "equal protection of the laws" just as much as if discrimination because of race, color or creed had occurred. In this case the discrimination is geographic.[2] Although the Federal Constitution does not give rise to the individual citizen's right to vote, since this franchise springs from the bosoms of the individual states, nonetheless, where state law grants such a right each citizen must be equally protected in the operation of such law.

The Attorney General, although conceding that the plaintiff has been deprived of a right guaranteed by the Fourteenth Amendment,[3] urges that the United States Supreme Court in Colegrove v. Green[4] has unmistakably indicated that the federal judiciary will not, under any circumstances, officiate over gerrymander disputes. However, I do not so strictly read the Colegrove case. The critical issues there in view were not focused upon a state deprivation of equal protection of the laws. The majority opinion therein reached its conclusion based upon two factors: (1) the Federal Reapportionment Act of June 18, 1929, 46 Stat. 21, as amended, 2 U.S. C.A. § 2a had no requirements as to compactness, contiguity and equality in population of congressional districts;[5] and, (2) the districting issue was "of a peculiarly political nature and therefore not meet for judicial determination" and should be corrected by Congress (or the State legislature).[6] By making reference to the State legislature's ability to deal with the problem of congressional districting, the Colegrove opinion inferentially touched upon the issue now before this court. However, a careful reading of the majority opinion makes it amply clear that the Supreme Court was primarily concerned with faithfully adhering to the separation of powers doctrine, and desired to defer to the Congress, a co-equal branch of the federal government, to deal with the matter of congressional districting.[7] A complete remedy lay within the control of another

1. e. g., Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

2. In the recent decision of Dyer v. Kazuhisa Abe, D.C.Hawaii 1956, 138 F. Supp. 220, 236, the court after referring to the recent segregation decisions remarked: " * * * The assumed delicacy of state-federal relations bowed to the principles of the Constitution. A classification which discriminates geographically has the same result. It deprives a citizen of his constitutional rights. Reasons of delicacy should no longer stay the judicial hand. The people of Hawaii need no court intervention to insure a democratic school system. They do need judicial aid in achieving a democratic legislature. *Any distinction between racial and geographic discrimination is artificial and unrealistic. Both should be abolished.*" (Emphasis supplied.)

3. "Section 1. * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*" Amendment XIV: (Emphasis supplied.)

4. 1945, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432.

5. This was the sole import of Wood v. Broom, 1932, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131.

6. Footnote 4, supra, 328 U.S. at page 552, 66 S.Ct. at page 1199.

7. " * * *. The short of it is that the Constitution has conferred upon Congress exclusive authority to secure fair

branch of the federal government, and inasmuch as Congress possessed the basic right to pass upon the qualifications of its own members, the Federal Judiciary was not going to become embroiled in such controversy. From the Colegrove action the instant suit is sharply distinguishable. Here, Congress has no authority to remedy the complained of wrong; and, all other remedies have been exhausted. Unless this court intervenes it is obvious no relief will ever be obtained. With no threatened conflict between the Congress and the Federal Judiciary, the question simply is, "Will the Federal Judiciary stand idly by and permit the mastication of a federally guaranteed constitutional right?" At such point the question of "political issue" or "delicacy of federal-state relationship" becomes secondary. It seems inconceivable to this court that where no other relief is available that the Federal Court does not have the power, as well as the duty in the face of admitted State violation to preserve the integrity of the Fourteenth Amendment.

The other cases cited by the Attorney General are also inapplicable. South v. Peters,[8] although recognizing the Federal court's basic jurisdiction, merely reiterates the policy of refusing to exercise equity powers in cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions. In the South case the complaint was against the manner in which the local law chose to distribute its electoral strength, admittedly a fundamental right retained by all states. Here, the controlling local law itself, in the form of a State constitutional provision is being ignored with the result that plaintiff is being denied "equal protection of the laws." Remmey v. Smith,[9] was dismissed because the action was premature in view of an untried state court remedy. Significantly, the court therein recognized that if the case had not been premature, a novel, and not yet decided question of law as to the Fourteenth Amendment existed.[10]

Clearly, this court does not have the right to grant the requested mandamus relief; however, apart from formal pleading the court can, and must, grant that relief which plaintiff's proof demonstrates him to be entitled. If the plaintiff can establish at the trial upon the merits the unconstitutionality of the presently effective apportionment provi-

representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility. If Congress failed in exercising its powers, whereby standards of fairness are offended, the remedy ultimately lies with the people. Whether Congress faithfully discharges its duty or not, the subject has been committed to the exclusive control of Congress. An aspect of government from which the judiciary, in view of what is involved, has been excluded by the clear intention of the Constitution cannot be entered by the federal courts because Congress may have been in default in exacting from States obedience to its mandate.

"The one stark fact that emerges from a study of the history of Congressional apportionment is its embroilment in politics, in the sense of party contests and party interests. The Constitution enjoins upon Congress the duty of apportioning Representatives 'among the several States * * * according to their respective Numbers, * * *.' Article I, § 2. Yet, Congress has at times been heedless of this command and not apportioned according to the requirements of the Census. It never occurred to anyone that this Court could issue mandamus to compel Congress to perform its mandatory duty to apportion. * * * To sustain this action would cut very deep into the very being of Congress. Courts ought not to enter this political thicket. The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. * * * " Colegrove v. Green, footnote 4, supra, 328 U.S. at pages 554, 555, and 556, 66 S.Ct. at pages 1200, 1201.

8. 1950, 339 U.S. 276, 70 S.Ct. 641, 94 L. Ed. 834.

9. D.C.Pa.1951, 102 F.Supp. 708.

10. Ibid. at pages 710, 711.

sions, such apportionment provisions should be struck down. Although such a declaration may result in some local inconvenience, the basic responsibility will remain upon the state to enact apportionment provisions which are not constitutionally offensive.[11] As recognized in the Colegrove majority opinion, no court can "affirmatively remap" the political districts of a state; however, we could "declare the existing electoral system invalid." [12]

The evil pointed up by the instant complaint is not new. Our would-be republican form of government has long been stigmatized by this same die-hard political parasite. The refusal of a legislature, such as the one in view, to voluntarily comply with the clear mandates of the state constitution to which such body owes its existence, is inexcusable; and, demonstrates anarchic contempt for the ideal that this government continue as one of high-principled *laws* rather than degenerate into one of unprincipled *men*.[13] The plaintiff and others similarly situated have previously been denied effective relief by all available local government forums; and, I, sitting as a court of equity, cannot turn a deaf ear to the complainant with the paradoxical pronouncement, "You *do* have a federal constitutional right, but you just *don't* have any remedy!"

Respectfully, I dissent.

11. The dissenting opinion in the Colegrove case footnote 4, supra, 328 U.S. at page 574, 66 S.Ct. at page 1213, in discussing the practical effect of striking down an unconstitutional apportionment division noted: " * * * It is said it would be inconvenient for the State to conduct the election in this manner. But it has an element of virtue that the more convenient method does not have—namely, it does not discriminate against some groups to favor others, it gives all the people an equally effective voice in electing their representatives as is essential under a free government, and it is Constitutional."

12. Footnote 4, supra, 328 U.S. at page 553, 66 S.Ct. at page 1200.

13. "The time has come, and the Supreme Court has marked the way, when serious consideration should be given to a reversal of the traditional reluctance of judicial intervention in legislative reapportionment. The whole trust of today's legal climate is to end unconstitutional discrimination. It is ludicrous to preclude judicial relief when a mainspring of representative government is impaired. Legislators have no immunity from the Constitution. The legislatures of our land should be made as responsive to the Constitution of the United States as are the citizens who elect the legislatures." Dyer v. Kazuhisa Abe, footnote 2, supra, 138 F.Supp. at page 236.