**James P. WESBERRY, Jr., and Candler Crim, Jr., Plaintiffs,**

**v.**

**S. Ernest VANDIVER, as Governor of the State of Georgia, and Ben W. Fortson, Jr., as Secretary of the State of Georgia, Defendants.**

**Civ. A. No. 7889.**

United States District Court
N. D. Georgia,
Atlanta Division.
June 20, 1962.

Scott, Scroggins & Cash (Frank T. Cash) Atlanta, Ga., for plaintiffs.

Eugene Cook, Atty. Gen. of Georgia and Paul Rodgers, Asst. Atty. Gen. of Georgia, Atlanta, Ga., for defendants.

Before TUTTLE and BELL, Circuit Judges, and MORGAN, District Judge.

GRIFFIN B. BELL, Circuit Judge.

This is the third in a series of suits filed in this court immediately following the decision of the Supreme Court in Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. In Sanders v. Gray, N.D.Ga., 1962, 203 F.Supp. 158,[1] we struck down the Georgia County Unit System of primary elections in the form in which it then existed because of resulting invidious discrimination to the plaintiffs who were residents of Fulton County. Then in Toombs v. Fortson, Civil Action No. 7883, N.D.Ga., 1962, 205

[1]. Now pending on appeal in the Supreme Court.

F.Supp. 248, again on the basis of resulting invidious discrimination, we found the General Assembly of Georgia to be malapportioned and required apportionment of at least one body of the Assembly according to population. In that case, and for the same reason, we struck down the statute requiring the election of senators on a rotation basis among the counties in each senatorial district. We withheld injunctive and other relief pending action on the part of the responsible state officials, executive and legislative, before the 1963 session of the General Assembly appropriate to ending the proscribed discrimination. Our action in each of these cases was premised on the denial to plaintiffs of equal protection of the laws under the Fourteenth Amendment to the Constitution.

Plaintiffs here are residents and qualified voters of Fulton County, Georgia, and as such are entitled to vote in the primary and general elections for members of the House of Representatives of the Congress of the United States from the Fifth Congressional District of Georgia. They likewise premise their cause on the Fourteenth Amendment, seeking the invalidation of the Georgia statute which sets up the districts for the election of the ten members of the House from Georgia and which provides the method of election. Georgia Code, Section 34–2301. They contend also that this statute is void as being contrary to Art. I, Section 2 of the Constitution of the United States which provides that members of the House of Representatives shall be elected by the people.[2]

Jurisdiction and three-judge status are based on Title 28 U.S.C.A. §§ 1343, 2201, 2202, 2281, 2284 and 42 U.S.C.A. §§ 1983 and 1988. Injunctive relief is sought against the defendants, the Governor and Secretary of State of Georgia, to the end that no elections may be held except on a state-at-large basis pending redistricting on "an equitable and representative" basis.

Georgia was awarded two members in the House of Representatives of the Congress under the Act of April 14, 1792 which apportioned representatives among the several states. 1 Stat. 253 (1792). The number of representatives allocated to Georgia increased gradually, based on population, from two to nine under the census of 1830. 2 Stat. 669 (1811); 3 Stat. 651 (1822); 4 Stat. 516 (1832). And elections in some states were on a district basis but in Georgia and in some of the other states they were on a state-at-large basis for nearly fifty years. Congress, in 1842, provided that representatives, where a state was entitled to more than one representative, should be elected from districts composed of contiguous territory, equal in number to the number of representatives to which a state might be entitled with no one district electing more than one representative. 5 Stat. 491 (1842). Georgia set up the district system in 1843 based on the 1840 census and has adhered to it at all times since then, including the election of members to the Congress of the Confederate States of America during the period of secession. Ga.Code, 1861, p. 12.

Districts were not required by the Apportionment Act of 1852, 9 Stat. 433 (1852), but were again required in 1862. 12 Stat. 572 (1862). In 1872 another element was added to the system. Not only must each district be of contiguous territory but also of an equal number of inhabitants as nearly as practicable. 17 Stat. 28 (1872). Under this Act Georgia was allocated nine representatives. Congress continued this system in 1882 and 1891 and the number of representatives from Georgia was increased to ten in 1882 and eleven under the 1891 Act. 22 Stat. 5 (1882); 26 Stat. 735 (1891). In 1901 Congress added the requirement that the districts be compact, 31 Stat. 733 (1901), and the 1911 Apportionment Act provided that:

"Representatives to the Sixty-third and each subsequent Congress

2. "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, * * *."

shall be elected by districts composed of a contiguous and compact territory and containing as nearly as practicable an equal number of inhabitants." 37 Stat. 13, 14 (1911)

There was no reapportionment after the census of 1920 and from 1910 to 1930 Georgia had twelve seats in the House. The Reapportionment Act of 1929, 46 Stat. 13, 26 (1929), provided that the House be reapportioned after each decennial census but failed to re-enact the requirements of compactness, contiguity, and equality of population in each district. 46 Stat. 13 (1929), Title 2 U.S. C.A. § 2.

Under that Act Georgia lost two seats in the House and the statute here under attack followed in 1931. Ga.Laws, 1931, p. 46; Code Section 34–2301 et seq. The General Assembly divided the state into ten congressional districts on the basis of allocating the several counties to the respective districts, and there have been no changes in the allocations to date.

The facts are not in dispute and are ample for final decision on the merits. The following table shows the population of each congressional district in 1930 as compared with 1960:

| District | Population, 1930 | Population, 1960 |
|----------|------------------|------------------|
| First | 328,214 | 379,933 |
| Second | 263,606 | 301,123 |
| Third | 339,870 | 422,198 |
| Fourth | 261,234 | 323,489 |
| Fifth | 396,112 | 823,680 |
| Sixth | 281,437 | 330,235 |
| Seventh | 271,680 | 450,470 |
| Eighth | 241,847 | 291,185 |
| Ninth | 218,496 | 272,154 |
| Tenth | 289,267 | 348,379 |

The burden of the complaint is the disproportionate population of the Fifth Congressional District as compared with the other districts. It is comprised of Fulton, DeKalb, and Rockdale Counties. The growth of Fulton and DeKalb Coun-

ties has been spectacular in recent years with the population of DeKalb increasing from 70,278 in 1930 to 256,782 in 1960, and that of Fulton from 318,587 to 556,326. It is to be noted that the population of each of the ten congressional districts has increased from a low of slightly under fifteen per cent in the Second District to just over one hundred eight per cent in the Fifth District.

It is the position of plaintiffs that the population of each district should be within a range of ten to fifteen per cent of the average district population based on a division of the number of districts into the total population of the state.[3] The population of Georgia according to the 1960 census was 3,942,936. For our purposes,[4] we will take 394,000 under the theory of plaintiffs as an average and examine the facts using the suggested variance of fifteen per cent. Under this theory no district should have a population of more than 453,000 nor less than 335,000. Applying the same theory to the districts as constituted in 1931 when the population of Georgia under the 1930 census was 2,908,506, an approximate average per district of 291,000, no district should have had a population of more than 335,000 nor less than 247,000.

The aforesaid table demonstrates that only the Fifth and Ninth Districts substantially varied from the fifteen per cent standard suggested by plaintiffs on the 1930 basis. The Second, Eighth, and Ninth Districts fell substantially more than fifteen per cent short of the average according to the 1960 census while the Fifth dramatically exceeded the variance.

We hasten to add that we neither expressly nor impliedly adopt any mathematical standard. We know of no basis for an exact standard. Cf. Sanders v. Gray, supra, where sufficient basis existed. We use plaintiffs' suggested standard here in amplification of their contentions.

It is clear by any standard however that the population of the Fifth District

3. An adoption of the view of the American Political Science Association.

4. To the nearest one thousand.

is grossly out of balance with that of the other nine congressional districts of Georgia and in fact, so much so that the removal of DeKalb and Rockdale Counties from the District, leaving only Fulton with a population of 556,326, would leave it exceeding the average by slightly more than forty per cent. It is apparent that giving effect to any reasonable population based standard will require the division of Fulton County into more than one district, something not heretofore done in Georgia. The population of Fulton County alone exceeds that of the nearest district in size—the seventh—by over twenty three per cent. A chain reaction affecting the make up of every congressional district in the state may be set off. We say this to demonstrate the legislative nature of the problem where a broad state-wide approach will be needed. We also point out that such a formula as suggested by plaintiffs, requiring as it would the division of Fulton County, may or may not be agreeable to the majority of the voters of Fulton County, assuming that they are entitled to a voice in the matter, and this again points up the desirability of solution if at all possible in the legislative forum. Of course, a division of Fulton County has not been suggested, only the formula.

The problem here is not peculiar to Georgia. For example, Florida has recently substantially changed its congressional districts by reason of the addition of four new congressmen making a total of twelve. The districts there now range in population from a low of 241,250 to a high of 660,345 as compared to the Florida average of 412,630 a variance greatly exceeding the suggested standard. Dade County with a population of 935,047 is divided among two districts, one consisting of a part of Dade County only, and the other consisting of an adjoining county and the balance of Dade County. Duvall, Hillsborough, and Pinellas Counties each constitutes a district under the new plan with populations respectively of 455,411, 397,788, and 374,665, a sharp example of the variance in population per district if counties are to continue as a basis for districts except where the population of a county is so large as to require division.

There are 435 congressional districts in the United States. Twenty two congressmen will be elected state-at-large in 1962. Of the remaining 413, the Fifth District of Texas has the largest population, 951,527. The Fifth District of Georgia, here under discussion is next. There are twenty two districts with populations exceeding 600,000. Eighty districts have populations more than fifteen per cent above the state average, while ninety have populations of more than fifteen per cent below the state district average. Using ten per cent as a variance, or tolerance, one hundred eight districts are above and one hundred twenty five are below the average, a total of two hundred thirty three or more than one-half of all congressional districts. These figures in no way reflect on the problem of deprivation of rights of the type here asserted through use of the gerrymander, a problem with which we are not concerned here but one that could well be within the rationale of any decision reached.

The following table shows the considable difference in population in the named states between the districts having the highest and lowest number of inhabitants. Even a cursory examination of it indicates that in virtually no state do the districts contain "as nearly as practicable an equal number of inhabitants" as was formerly required by the Congress.

The table is based on only four hundred thirteen out of the total of four hundred thirty five congressional districts. Only forty two states are listed. The twenty two of the seats to be filled by elections at-large are: Alabama—8, Alaska—1, Connecticut—1, Delaware—1, Hawaii—2, Maryland—1, Michigan—1, Nevada—1, New Mexico—2, Ohio—1, Texas—1, Vermont—1, and Wyoming—1. The districts shown are as constituted January 1, 1963 while the populations are according to the 1960 census.

| State | Average Population Per District | High | Low |
|---|---|---|---|
| Arizona | 434,053 | 663,510 | 198,236 |
| Arkansas | 446,568 | 575,385 | 332,844 |
| California | 414,009 | 591,822 | 301,172 |
| Colorado | 438,486 | 653,954 | 195,551 |
| Connecticut | 507,046 | 653,589 | 318,942 |
| Florida | 412,629 | 660,345 | 237,235 |
| Georgia | 394,311 | 823,680 | 272,154 |
| Idaho | 333,595 | 409,949 | 257,242 |
| Illinois | 420,100 | 557,221 | 277,169 |
| Indiana | 423,863 | 697,567 | 290,596 |
| Iowa | 393,933 | 403,442 | 353,156 |
| Kansas | 435,722 | 539,592 | 373,583 |
| Kentucky | 434,022 | 610,947 | 350,839 |
| Louisiana | 407,127 | 536,029 | 263,850 |
| Maine | 484,632 | 505,465 | 484,632 |
| Maryland | 442,955 | 711,045 | 243,570 |
| Massachusetts | 429,048 | 478,962 | 376,336 |
| Michigan | 434,621 | 802,994 | 177,431 |
| Minnesota | 426,733 | 482,872 | 375,475 |
| Mississippi | 435,628 | 608,441 | 295,072 |
| Missouri | 431,881 | 505,854 | 381,602 |
| Montana | 337,383 | 400,573 | 274,194 |
| Nebraska | 470,443 | 530,507 | 404,695 |
| New Hampshire | 303,460 | 331,818 | 275,103 |
| New Jersey | 404,452 | 585,586 | 255,165 |
| New York | 409,324 | 469,908 | 348,940 |
| North Carolina | 414,195 | 491,461 | 277,861 |
| North Dakota | 316,223 | 333,290 | 299,156 |
| Ohio | 422,017 | 726,156 | 236,288 |
| Oklahoma | 388,047 | 552,863 | 227,692 |
| Oregon | 442,171 | 522,813 | 265,164 |
| Pennsylvania | 419,235 | 553,154 | 303,026 |
| Rhode Island | 429,744 | 459,706 | 399,782 |
| South Carolina | 397,099 | 531,555 | 272,220 |
| South Dakota | 340,257 | 497,669 | 182,845 |
| Tennessee | 396,343 | 627,019 | 223,387 |
| Texas | 435,439 | 951,527 | 216,371 |
| Utah | 445,313 | 572,654 | 317,973 |
| Virginia | 396,694 | 539,618 | 312,890 |
| Washington | 407,602 | 510,512 | 342,540 |
| West Virginia | 372,084 | 422,046 | 303,098 |
| Wisconsin | 395,177 | 530,316 | 236,870 |

It is readily apparent from these undisputed facts that plaintiffs, not unlike many millions of other citizens throughout the Republic, are being deprived of equal treatment arising from the excess in population of their congressional district as compared with that of other districts in Georgia. Such unequal or discriminatory treatment to be actionable, if judicially cognizable, a mat-

ter to be hereinafter discussed, must reach the point of invidiousness. Baker v. Carr, supra; Sanders v. Gray, supra; and Toombs v. Fortson, supra.

■ Our jurisdiction of a matter such as this can no longer be doubted, and it is settled that plaintiffs asserting rights of the type here involved have standing to sue. Baker v. Carr; Wood v. Broom, 1932, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131; Colegrove v. Green, 1946, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432; Scholle v. Hare, 1962, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1; and W. M. C. A., Inc. v. Simon, 1962, 30 L.W. 3383, 82 S.Ct. 1234. We hold too that the issue presented is justiciable but that question requires some elaboration.

■ And if the issue were one solely of state action under the Fourteenth Amendment, separate and apart from rights and duties devolving on the Congress under the Constitution and from congressional action or inaction, our problem would be greatly simplified. We would apply the test for invidious discrimination by considering all relevant factors, including a determination of rationality of state policy behind the statutory system, arbitrariness, whether the system has a historical basis in our political institutions, together with the presence or absence of political remedy. Baker v. Carr; Sanders v. Gray; and Toombs v. Fortson. The test is to be made on the sum of all of these factors and the asserted violation must be clear for we are dealing with the constitutionally based relationship between federal and state governments. American Federation of Labor v. Watson, 1946, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; McGowan v. Maryland, 1961, 366 U.S. 420, 81 S.Ct. 1101, 66 L.Ed.2d 393.

■ If the state action—here the statute setting up congressional districts—offends fundamental political concepts inherent in a republican form of government, giving due regard to each factor and the rights of the plaintiffs and all others in their class as compared to those similarly situated in other congressional districts of Georgia, the statute must be stricken because of being discriminatory to the degree of invidiousness.

■ ■ In our view the statute here when enacted reflected a rational state policy to set up the congressional districts in Georgia with some reasonable relation to population. On the other hand it now reflects a system which has become arbitrary through inaction when considered in the light of the present population of the Fifth District and as measured by any conceivable reasonable standard. The statute does have a historical basis in that it is of the type used in the remaining states of the Union with but few exceptions for more than one hundred years, and of a type that was required by the Congress from 1872 through 1929. As to political remedy, we only recently required by our decision in Toombs v. Fortson that the General Assembly of Georgia be fairly apportioned. It may well be that the arbitrariness which we find to be present as the statute relates to the Fifth District and to the rights of plaintiffs will be corrected by the reapportioned Assembly.

■ Our view is buttressed by a due regard for the admonition in Baker v. Carr that a "judicially manageable standard" be adopted. This dictates that a reasonable time be afforded for the normal state governmental processes, where there is a substantial chance of relief as we believe there is, to run their course.

■ So tested, from the standpoint of Fourteenth Amendment rights or the right to choose Representatives under Art. 1, Section 2 of the Constitution, we do not now find proscribed invidiousness. We would deny relief at this time but retain jurisdiction to again consider the contentions of plaintiffs, if necessary, after the expiration of a reasonable time for relief by way of political remedy.

But we cannot rest our decision at or on this point because the problem goes deeper. We are not dealing simply with state action under the Fourteenth

Amendment or in violation of Art. 1, Section 2 of the Constitution for the state action complained of is inextricably subject to the rights allocated to Congress under the Constitution. And defendants are entitled to their due—a final decision.

As was said for the majority in Colegrove v. Green, supra, where similar relief was sought in a suit alleging malapportioned congressional districts:

"The petitioners urge with great zeal that the conditions of which they complain are grave evils and offend public morality. The Constitution of the United States gives ample power to provide against these evils. But due regard for the Constitution as a viable system precludes judicial correction. Authority for dealing with such problems resides elsewhere. Article I, Section 4 of the Constitution provides that 'The Time, Places and Manner of holding Elections for * * * Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at anytime by Law make or alter such Regulations, * * *' The short of it is that the Constitution has conferred upon Congress exclusive authority to secure fair representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility. If Congress failed in exercising its powers, whereby standards of fairness are offended, the remedy ultimately lies with the people. Whether Congress faithfully discharges its duty or not, the subject has been committed to the exclusive control of Congress. An aspect of government from which the judiciary, in view of what is in-volved, has been excluded by the clear intention of the Constitution cannot be entered by the federal courts because Congress may have been in default in exacting from States obedience to its mandate." [5]

Only seven members of the court participated in this decision, two concurring in the opinion by Justice Frankfurter and Justice Rutledge concurring in the result to make the majority. His concurrence was based on the view that the complaint should be dismissed for want of equity and we perceive this to be the holding of the majority. He recognized that the court had jurisdiction and that a justiciable issue was presented, citing Smiley v. Holm, 1932, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795. He pointed out that four of the nine justices in Wood v. Broom, supra, where the majority dismissed a similar suit on the ground that there was no congressional requirement after the 1929 Apportionment Act of compactness, contiguity or equality in the number of inhabitants for congressional districts, were of the opinion that dismissal should have been for want of equity. His basis for the want of equity holding was that the court would be pitched into delicate relation to the functions of state officials and the Congress compelling them to take action which they have declined to take voluntarily, and because the short time remaining before the election made effective relief doubtful. He thought a state-at-large election would deprive Illinois citizens of representation by districts "which the prevailing policy of Congress demands;" citing 46 Stat. 26, c. 28, as amended, Title 2 U.S.C.A. § 2a. He concluded:

"If the constitutional provisions on which appellants rely give them the substantive rights they urge,

---

5. The Constitution enjoins upon Congress the duty of apportioning Representatives "among the several States * * * according to their respective Numbers, * * *." Article I, Section 2. Congress has at times been heedless of this command and not apportioned according to the requirements of the census. It has never oc-curred to anyone that the court could mandamus the Congress to perform its mandatory duty to apportion. Colegrove v. Green, 328 U.S. pp. 554–555, 66 S.Ct. p. 1200.

Article I, Section 5 of the Constitution makes each House the sole judge of the qualifications of its own members.

other provisions qualify those rights in important ways by vesting large measures of control in the political subdivisions of the government and the state. There is not, and could not be except abstractly, a right of absolute equality in voting. At best there could be only a rough approximation. And there is obviously considerable latitude for the bodies vested with those powers to exercise their judgment concerning how best to attain this, in full consistency with the Constitution.

"The right here is not absolute. And the cure sought may be worse than the disease."

Justices Douglas and Murphy joined Justice Black in a dissent. It was their view that the case involved the federally protected right to vote. Article I, Section 2, Const., Fourteenth Amendment, Section 2, and it was implicit in their dissent that they considered this right to be absolute, equating it with a denial of the franchise on account of race, creed or color. Cf. Ex parte Yarbrough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; Nixon v. Herndon, 1927, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; and United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L. Ed. 1368. They would have invalidated the state apportionment statute and afforded plaintiffs the right to vote in state-at-large elections. They thought the state had violated a duty to bring about approximately equal representation of citizens in the Congress.

We have dwelt at some length on the Colegrove case because it is decisive here. It is in point and a controlling precedent if still in force. It has been cited as authority in cases involving only state action where perhaps it is no longer a controlling authority in view of Baker v. Carr. Cf. South v. Peters, 1950, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834; Kidd v. McCanless, 1956, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157; Radford v. Gary, 1957, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540. We make our determination of its efficacy by a consideration of the preservative treatment given it in Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 110 and Baker v. Carr.

Gomillion involved a statute gerrymandering the City of Tuskegee, Alabama, so as to deny the vote to colored citizens. Justice Frankfurter, author of Colegrove, wrote the decision for the eight justices making the majority, Justice Douglas concurring in the result but adhering to his dissent in Colegrove, and South v. Peters, supra. In distinguishing Colegrove it was said that the dismissal of the complaint was affirmed "on the ground that it presented a subject not meet for adjudication." The court stated that the decisive facts of Gomillion were wholly different from the considerations found controlling in Colegrove. The complaint in Colegrove was only as to the dilution of the strength of votes as a result of legislative inaction over a course of many years as compared with affirmative legislative action to deprive complainants of their votes in Gomillion.

"* * * When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment. In no case involving unequal weight in voting distribution that has come before the Court did the decision sanction a differentiation on racial lines whereby approval was given to unequivocal withdrawal of the vote solely from colored citizens. Apart from all else, these considerations lift this controversy out of the so-called 'political' arena and into the conventional sphere of constitutional litigation." 364 U.S. pp. 346–347, 81 S.Ct. p. 130

\* \* \* \* \* \*

"* * * While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens,

and only colored citizens, of their theretofore enjoyed voting rights. That was not Colegrove v. Green." 364 U.S. p. 347, 81 S.Ct. p. 130.

Thus Gomillion taught in 1960 that Colegrove was still a living precedent and we must determine if it was overruled or sapped of its strength by Baker v. Carr. That case, in one fell swoop, lifted state political action offending the Fourteenth Amendment from the ancient doctrine whereunder it was thought improper for courts to enter the "political thicket" so often involved in reapportionment and related problems.

We have carefully considered its import and have noted that the court was at pains to distinguish Colegrove. The rationale of the decision goes no further than to open the doors of the courts for the purpose of adjudicating consistency of state action with the Federal Constitution where no question is concerned involving a coequal political branch of the government. The treatment of Colegrove in Gomillion was reiterated. The court stated that Colegrove appeared to be based on a refusal to exercise equity's powers.

The various concurring opinions in Baker v. Carr shed much light on the meaning of the majority opinion. Justice Douglas put aside the problem of "political" questions involving the distribution of power between the Court, Congress and the Chief Executive, and noted that the power of Congress to prescribe qualifications for voters and thus override state law was not in issue. He stated that the Federal Judiciary does not intervene where the Constitution assigns a particular function wholly and indivisibly to another department, and then in closing stated that the state legislative apportionment question before the court was removed from the impediment of Colegrove and the cases following it by the treatment given those cases in the majority opinion, i. e., that they were based on a refusal to exercise equity's power. Justice Clark also distinguished Colegrove. Justice Frankfurter in dissenting stated that the appellants sought to distinguish Colegrove on the ground that congressional, not state legislative, apportionment was involved, and we believe that this is the course that the majority of the court took. Justice Harlan described the holding in Colegrove as a declination by the court to adjudicate a challenge to the apportionment of seats by a state in the federal House of Representatives in absence of a controlling act of Congress, citing Wood v. Broom, supra.

It would be extraordinary indeed for the court to have departed any more than was absolutely necessary from the previous standard of withholding judicial relief in matters of the kind involved in Baker v. Carr, and a good reason to preserve the Colegrove doctrine while at the same time reversing the body of law as it concerned state action alone was that fairly apportioned state legislatures might well alleviate congressional district disparity. But whatever the reason we think Colegrove stands and so long as it does it will be our guide.

We do not deem it to be a precedent for dismissal based on the nonjusticiability of a political question involving the Congress as here, but we do deem it to be strong authority for dismissal for want of equity when the following factors here involved are considered on balance: a political question involving a coordinate branch of the federal government; a political question posing a delicate problem difficult of solution without depriving others of the right to vote by district, unless we are to redistrict for the state; relief may be forthcoming from a properly apportioned state legislature; and relief may be afforded by the Congress.[6]

6. Representative Celler in a hearing before the Committee on the Judiciary, House of Representatives, recently stated that it was impracticable to draw congressional district lines in Washington. He stated that the economic and social interests of an area, its topography and geography, means of transportation, the desires of the inhabitants as well as their elected representatives, and the political factors

Being persuaded of a want of equity in the position of plaintiffs to the extent that no cognizable constitutional claim is presented under the facts and subsisting authorities, their cause must be and is DISMISSED.

TUTTLE, Circuit Judge (Concurring in Part and Dissenting in Part).

I concur in that part of the Court's opinion that denies an injunction at this time. I also concur in the statement of the facts. Because, however, I disagree with the conclusion that the suit should be dismissed, and because my conclusion that the injunction should be denied is based on somewhat different reasoning than that of my colleagues, I consider it appropriate to state my separate views.

The basis on which I would hold that the Court should now decline to grant the relief sought by these plaintiffs is simple. In Baker v. Carr the Supreme Court stressed as one of the factors which it considered as warranting a federal court's granting relief in a case of legislative malapportionment within a state the absence of any practical means by which the plaintiffs might hope to obtain relief at the hands of the state legislature. We also stressed this circumstance in the earlier cases decided by this Court. See Sanders v. Gray, N.D.Ga., 1962, 203 F.Supp. 158, and Toombs v. Fortson, N.D.Ga., 1962, 205 F.Supp. 248.

In view of the fact that this Court has now held that the Legislature of the State of Georgia must be apportioned in such a manner as to make it more responsive to population, it cannot be said now that there is no reasonable likelihood that the Georgia Legislature as properly constituted will fail in the future to rectify the gross inequalities that we find now exist in the Georgia Congressional Districts. I think, therefore, that it is

a part of judicial statesmanship for this Court to refrain from stepping into this particular area until after the Legislature of the State of Georgia has had a fair opportunity to correct the present abuses.

The point of difference between my views and those of my colleagues is that I am not convinced that if the Georgia Legislature persists in the future in maintaining congressional districts as grossly disproportionate as they are today, the federal courts would have no power to take cognizance of such a situation and declare the state apportionment laws unconstitutional.

The view of the majority appears to be that even though the State Legislature takes no remedial action, the plaintiffs may not obtain the relief they seek at the hands of this Court. This, they say, results from the fact that the United States Congress has the power under Article I, Section 4, of the Constitution to require the state governments to eliminate the inequalities like that here complained of. The provisions of that Section are:

"The Times, Places and Manner of holding Elections for * * * Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations * * *."

The majority opinion reads the several opinions of the Justices of the Supreme Court in Baker v. Carr as perpetuating what my colleagues construe to be the rationale of Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, that is that where Congress has the power to deal with a matter which the States may also regulate, federal courts should not interfere with action taken by the State, even though in violation of the

should all be considered and that state legislatures are far better equipped to determine and evaluate those factors than either the Congress or any national agency it might designate to do so. Under the proposed legislation the establishment of districts would be subject to review by

the Federal District Courts. Hearing, June 24, 1959, before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, 86th Congress, 1st Sess., on House Resolutions 73, 575, 8266 and 8473.

Fourteenth Amendment to the Constitution, because "due regard for the Constitution as a viable system precludes judicial correction." 328 U.S. 549, at 554, 66 S.Ct. 1198, at 1200.

It must be borne in mind that the opinion which contained the foregoing language was approved in whole by only three members of the Supreme Court out of the seven who participated in the decision. A fourth member of the Court, thus making a majority, concluded that the judgment of the lower court should be affirmed, but Justice Rutledge's views make it clear that he did not accept the theory or principle that it was beyond the competence of the federal courts to grant the relief sought, but rather that he felt the plaintiffs had not demonstrated their right to equitable relief under the circumstances, including the fact that the upcoming election was so imminent as to make it "doubtful whether action could, or would, be taken in time to secure for petitioners the effective relief they seek."

I am of the firm conviction that the majority opinion of the Supreme Court in Baker v. Carr makes it clear that nothing said in any of the opinions in Colegrove v. Green denies to the federal courts the power to grant relief in a congressional district case if the complaint and proof establish a right to equitable relief from grossly disproportionate districting. On page 226 of its opinion in Baker v. Carr, the majority outlines what constitutes a non-justiciable "political question." It does this by enumerating the type of question that the Court had theretofore held to be non-justiciable "political questions."

"We have no question decided, or to be decided, by a political branch of government co-equal with this Court. Nor do we risk embarrassment of our Government abroad, or grave disturbance at home if we take issue with Tennessee as to the constitutionality of her action here challenged. Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking."

As to the first of these questions referred to by the Court, which is the one which the majority here feels prevents judicial action by this Court, I consider it necessary to point out the following: Complete relief can be granted to the plaintiffs here without the slightest interference with prerogatives or powers of the Federal Congress. That body, under the reapportionment statutes referred to in the majority opinion, has directed the State of Georgia to divide the people of the State into congressional districts. Presumably Congress intended for the State to do so within constitutional standards. The fact that Congress did not expressly prescribe that congressional districts should be reasonably equal as to population does not, of course, prevent the State from districting according to equal population, nor, it seems to me, does it excuse the State from failing to do so if a failure to do so works an unconstitutional deprivation on the plaintiffs.

I find nothing in either Colegrove v. Green or in the language of the Supreme Court in Baker v. Carr discussing Colegrove in conflict with the views expressed here: that where Congress has directed a State to "regulate" a matter which the Constitution itself says shall initially be dealt with by the State, the State may not then, immune from judicial interference, exercise such power in an unconstitutional manner merely because Congress also has power to "at any time by law make or alter such regulations."

It is, therefore, my opinion that this Court should deny the injunction at this time, but that it should retain jurisdiction of the cause in order to give the State Legislature an opportunity to remedy what this Court has unanimously found to constitute a gross inequity. In default of such action by the State within a reasonable time, the Court should proceed to grant the relief prayed for.