**Paul W. PREISLER et al., Plaintiffs,**

**v.**

**The SECRETARY OF STATE OF MISSOURI and the Attorney General of Missouri, Defendants,**

**and**

**F. V. Heinkel, R. J. Rosier, W. W. Beckett, A. D. Sappington, L. O. Wallis, Miller Hern, Herman Hetlage, Herman Kertz, Turpin Youtsey and Glen Myers, Intervenor-Defendants.**

**No. 1064.**

United States District Court
W. D. Missouri,
Central Division.

Aug. 5, 1966.

954

Edwards, Hess & Collins, Macon, Mo., for intervenor-defendants.

Paul W. Preisler, St. Louis, Mo., for plaintiffs.

Norman H. Anderson Atty. Gen., Jefferson City, Mo., J. Gordon Siddens, Asst. Atty. Gen., Jefferson City, Mo., Thomas J. Downey, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

Before MATTHES, Circuit Judge, and OLIVER and COLLINSON, District Judges.

JOHN W. OLIVER, District Judge.

This Congressional reapportionment case is a sequel to Preisler v. Secretary of State of Missouri, W.D.Mo.1965, 238 F. Supp. 187, decided January 4, 1965. Preisler I pended as consolidated cases Nos. 923 and 924. In those consolidated cases plaintiffs sought and obtained a declaration that the 1961 Congressional Redistricting Act of Missouri was unconstitutional. In this case, No. 1064, the same plaintiffs contest the constitutional validity of Missouri's 1965 Congressional Redistricting Act.[1]

The point of beginning in this case, as it was in Preisler I, must be the 1964 decision of the Supreme Court in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). In Preisler I the present defendants conceded that the constitutional principles enunciated in Wesberry controlled the disposition of that case "unless the Supreme Court overrules or modifies such decision" (238 F.Supp. at 189). Defendants, as they must, make the same concession in this case. The Supreme Court has not modified or overruled Wesberry v. Sanders. Wesberry v. Sanders controlled Preisler I; it controls Preisler II.

In Preisler I this Court held that "Wesberry v. Sanders, supra, teaches that apportionment is void when it appears from the scheme thereof there has been inadequate consideration to equality in population as between districts in the same State" (238 F.Supp. at 190). We emphasized that Wesberry v. Sanders determined that "the command of Art. I, § 2 (of the Constitution of the United States) * * * means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's" (238 F.Supp. at 190, quoting directly from 376 U.S. at 7–8, 84 S. Ct. 526). Further, we stated that the "mandate [of Art. I, § 2, as construed in Wesberry v. Sanders] precludes the consideration of 'area' representation as being a valid factor in the determination of Congressional Representation" (238 F. Supp. at 190).

In Preisler I this Court stayed its hand "until the Legislature of the State of Missouri has once more had an opportunity to deal with the problem" (238 F. Supp. at 191). We refused to presume that "the Legislature of the State of Missouri will refuse to take all necessary action to comply with its duty under the Federal [Constitution], as well as its own State[,] Constitution."[2]

1. Missouri, by reason of loss of population between the 1950 census and the 1960 census, was required by Article 3, Section 45 of the 1945 Constitution of Missouri, V.A.M.S., and by Section 2(c) (5) of Title 2, United State Code, to redistrict the State of Missouri into ten new districts (rather than the eleven districts to which it was entitled under the 1950 census) or, failing so to do, under the federal statute, to elect the ten congressional representatives allotted it under the 1960 census by elections-at-large.

The failure of the Missouri General Assembly to properly redistrict after the 1930 census forced the election of Missouri's entire congressional delegation to be held at large in 1932. For the history of that failure see State ex rel. Carroll v. Becker, Secretary of State, (1932) 329 Mo. 501, 45 S.W.2d 533, affirmed 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807 (1932), on the authority of

Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932).

2. Article 3, Section 45, of the 1945 Missouri Constitution provides that "[w]hen the number of representatives to which the state is entitled in the House of the Congress of the United States under the census of 1950 and each census thereafter is certified to the governor, the general assembly shall by law divide the state into districts corresponding with the number of representatives to which it is entitled, which districts shall be composed of contiguous territory as compact and as nearly equal in population as may be."

The General Assembly of Missouri is therefore under mandate to act under both the Constitution of Missouri and the Constitution of the United States. We, of course, consider only its duty under the Federal Constitution. We note, however, that the addition of Article 3, Section 45, to the 1945 Missouri Consti-

Using respectful but unequivocal language, this Court held in *Preisler I* on January 5, 1965, that "the State Legislature of Missouri has an unmistakable duty to reapportion the Congressional Districts of that State in accordance with the principles enunciated in Wesberry v. Sanders [376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)]; Martin v. Bush [376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964)]; and Colegrove v. Green [328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946)]" (238 F.Supp. at 191). Jurisdiction of Cases Nos. 923 and 924 was therefore retained "in order to afford the Legislature of the State of Missouri a full opportunity to 'heed the constitutional mandates' considered in the above cited authorities" (238 F.Supp. at 191).

The Seventy-third General Assembly of Missouri enacted the legislation now before this Court in 1965 after our decision in *Preisler I*. The 1965 Act, Sections 128.202 to 128.305, constituting Chapter 128 of Title IX of the Missouri Statutes, as amended (September, 1965 Pamphlet V.A.M.S., pages 76–77), originated as Senate Bill No. 320 and was introduced on March 4, 1966. After various changes and substitutions, that bill, as amended, was passed by the 1965 Missouri General Assembly on the final day of its session and was later approved by the Governor on August 5, 1965.[3]

Particular Changes Made by the 1965 Act in regard to the Redistricting Provided in the 1961 Act

The changes made in the 1961 redistricting by the 1965 Act are illustrated in Table I below. The "deviation" columns in that table represent the difference between the population allocated to a particular district by the 1961 Act and by the 1965 Act, respectively, and the population that would have been included in each of Missouri's ten congressional districts if absolute mathematical precision was practicable.

An ideal average district would have included 431,981.3 population (4,319,813 total population ÷ 10 districts) in each of the ten districts. We recognize, as did Wesberry v. Sanders, that "it may not be possible to draw congressional districts with mathematical precision" (376 U.S. at 18, 84 S.Ct. at 535, 11 L.Ed.2d 481). But recognition of that fact may not be converted into an "excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives" (376 U.S. at 18, 84 S.Ct. at 535).

---

tution imposed the duty to provide districts "of contiguous territory as compact * * * as may be" formerly, but not presently, required by federal law. See Wood v. Bloom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932), for the history of the elimination of the compactness of contiguous territory requirement from the federal law.

3. Although Senate Bill No. 320, as amended, became the law of Missouri on August 5, 1965, plaintiffs did not take any action to contest the constitutional validity of that legislation until January 17, 1966. On that date plaintiffs filed appropriate motions in Cases Nos. 923 and 924, invoking the jurisdiction of this Court that had been retained in those cases.

At a pretrial conference held in Cases Nos. 923 and 924 on January 25, 1966, all parties agreed on procedures that permitted (1) the withdrawal of the mo-

tions filed in those cases; (2) the filing of a new complaint that would contest the validity of the 1965 legislation for the 1968 and 1970 elections but that would not put in issue the constitutional validity of that legislation so far as the 1966 congressional elections were concerned; and (3) agreed upon a time schedule that contemplated a final decision from this Court before the convening of the next regular session of the General Assembly of Missouri in January, 1967.

This case, Case No. 1064, accordingly was filed February 14, 1966; it was at issue on February 25, 1966; and, at a pretrial conference held March 9, 1966, all facts not admitted by the pleadings were stipulated of record, the parties further agreeing that there are no disputed questions of fact within the meaning of Rule 56 of the Rules of Civil Procedure. Final briefs were filed May 17, 1966, and oral argument was heard May 27, 1966.

Table I is as follows:

TABLE I

Changes in 1961 Redistricting Made by 1965 Act

| DIST. NO. | 1961 Act POPULATION | 1965 Act POPULATION | Changes made by 1965 Act | TOTAL POPULATION SHIFT | 1961 DEVIATION | 1965 DEVIATION |
|---|---|---|---|---|---|---|
| 1 | 466,482 | 474,895 | Shifts of St. Louis County Townships and one St. Louis city ward between First, Third and Ninth Districts. | + 8,413 | +34,500.7 | +42,913.7 |
| 2 | 506,854 | 460,501 | Shift of St. Louis County Townships and one St. Louis ward between First and Second Districts | —46,353 | +74,872.7 | +28,519.7 |
| 3 | 480,222 | 469,888 | Shift of two St. Louis wards between First Second and Third Districts | —10,334 | +48,240.7 | +37,906.7 |
| 4 | 418,981 | 402,813 | Shift of four Kansas City wards to Fifth District. Shift of Barton County from Seventh District | +16,168 | —13,000.3 | —29,168.3 |
| 5 | 378,499 | 405,780 | Shift of four Kansas City wards from Fourth District | +27,281 | —53,482.3 | —26,201.3 |
| 6 | 388,486 | 394,236 | Shift of Mercer County from the Ninth District | + 5,750 | —43,495.3 | —37,745.3 |
| 7 | 436,933 | 425,820 | Shift of Barton County to the Fourth District | —11,113 | + 4,951.7 | — 6,161.3 |
| 8 | 452,385 | 443,747 | Shift of Wayne County to Tenth District | — 8,638 | +20,404.7 | +11,765.7 |
| 9 | 409,369 | 451,893 | Shift of Mercer County to Sixth District. Shift of St. Louis County townships from First District | +42,524 | —22,612.3 | +19,911.7 |
| 10 | 381,602 | 390,240 | Shift of Wayne County from the Eighth District | — 8,638 | —50,379.3 | —41,741.3 |

Table II below is an extension of the table originally set forth in *Preisler I* as it appeared on page 188 of 238 F.Supp. That table repeats the malapportionment variances under the 1961 Act between the Second and Third Districts and the other respective districts, to which we have added new columns for the First District and the 1965 figures for all three districts for the reasons set forth in the footnote below.[4]

4. The Second and Third Districts, both located in the St. Louis metropolitan area, were the two districts under the 1961 Act that deviated the greatest from the ideal average. Those two districts alone were allocated 123,112 more population under the 1961 Act than should have been included under an ideal system of representation (the Second District was allotted 74,872 more population than the ideal average under the 1961 Act; the Third District, 48,240).

The figures on the First District were added to Table II because that district became the most malapportioned district under the 1965 Act. Its 1965 assigned population of 474,895 exceeded the ideal average by 42,913 population. The discrimination against the St. Louis metropolitan area, evidenced by the 1961 Act, was continued under the 1965 Act. The 1965 Act allocated 109,338 excess population to the First, Second and Third Districts, all located in that geographical area (the First District exceeded the ideal average by 42,913 population; the Second by 28,519; and the Third by 37,-906). While the ranking of the First, Second and Third Districts so far as their respective malapportionment was concerned was changed under the 1965 Act, those three districts again were the most acutely malapportioned under the 1965 Act as they had been under the 1961 Act. Appendix A attached here illustrates all changes made by the 1965 Act and should be studied in conjunction with Table I.

Table II is as follows:

## TABLE II

Comparison of District Populations Under 1961 Act and 1965 Act

| DIST. NO. | POPULATION | | Differs from Population of Third District | | Differs from Population of Second District | | Differs from Population of First District | |
|---|---|---|---|---|---|---|---|---|
| | 1961 Act | 1965 Act | 1961 | 1965 | 1961 | 1965 | 1961 | 1965 |
| 1 | 466,482 | 474,895 | — 13,740 | + 5,007 | — 40,372 | +14,394 | — | — |
| 2 | 506,854 | 460,501 | + 26,632 | — 9,387 | — | — | +40,372 | —14,394 |
| 3 | 480,222 | 469,888 | — | — | — 26,632 | + 9,387 | +13,740 | — 5,007 |
| 4 | 418,981 | 402,813 | — 61,241 | —67,075 | — 87,873 | —57,688 | —47,501 | —72,082 |
| 5 | 378,499 | 405,780 | —101,723 | —64,108 | —128,355 | —54,721 | —87,983 | —69,115 |
| 6 | 388,486 | 394,236 | — 91,736 | —75,652 | —118,368 | —66,265 | —77,996 | —80,659 |
| 7 | 436,933 | 425,820 | — 43,289 | —44,068 | — 69,921 | —34,681 | —29,549 | —49,075 |
| 8 | 452,385 | 443,747 | — 27,837 | —26,141 | — 54,469 | —16,754 | —14,007 | —31,148 |
| 9 | 409,369 | 451,893 | — 70,853 | —17,995 | — 97,485 | — 8,608 | —57,113 | —23,002 |
| 10 | 381,602 | 390,240 | — 98,620 | —79,648 | —125,252 | —70,261 | —84,880 | —84,655 |

Study of Table I and II reveals that the 1965 Act actually increased the malapportionment that existed under the 1961 Act in three of the ten districts. Under the 1961 Act, the urban First District had an excess of 34,500 population. The 1965 Act increased the population of that district to 474,895, or 42,913 in excess of the ideal average population of 431,981. The Fourth District, on the other hand, was 13,000 population below the ideal average under the 1961 Act. The deficiency in population of that essentially rural district was increased to 29,168 population by the 1965 Act. Under the 1965 Act only 402,813 population was allocated to that district, as contrasted with the 418,981 population that had been allocated to that district under the 1961 Act.

The 1965 Act not only increased the 1961 disparity in regard to the rural Seventh District; it shifted that rural district of declining population on the side of overweighting the votes of the population as contrasted to the 1961 Act that allocated 436,933 population to that district, only 4,951 population in excess of the ideal average.

Slight improvements in the extent of deviation were produced in the other seven districts but the fact remains that in all except one district, the deviations exceeded 10,000 population; that eight out of the ten districts deviate from the ideal average by 19,911 to 42,913; and that four of the districts have deviations of more than 35,000 population. Deviations of that extent can not fairly be described as "minor" deviations.

Examination of Table I and Table II demonstrates that the overall pattern of malapportionment under the 1961 Act and under the 1965 Act was the same. Under both Acts the population deviations from the ideal average district exceeded approximately 20,000 population except for two districts. Both have the same pattern of overvaluation and overweight of the votes in the rural geographical areas, as contrasted with the votes in the two metropolitan areas of the State. The facts in regard to the St. Louis metropolitan area are stated in footnote 4.

The Kansas City metropolitan area presents a slightly different factual situation. Under the 1961 Act, several heavily populated wards from within the city limits of Kansas City were included in both the Fourth and the Sixth Districts in order to increase the deficient population of those two essentially rural districts. Under the 1965 Act some of those wards were shifted to the Fifth District but, again, the City of Kansas City was split between three separate Congressional districts, the Fourth, Fifth and Sixth. The population of the City of Kansas City under the 1965 Act continued to be utilized to increase the deficient population of two essentially rural districts in order that the geographical area allotted to those rural districts would be permitted to cover essentially the same geographical areas allotted to them by the constitutionally impermissible 1961 Act.[5]

■ The legislative history of Senate Bill No. 320, of which we take judicial

5. Under the 1961 Act the Sixth District to the north of Kansas City had an allocation of only 388,486 population with a minus deviation from an ideal district of 43,495. The 1965 Act's effort to correct that obviously unconstitutional disparity was reflected by the 1965 Act's shift of rural Mercer County, population 5,750, from the Ninth District in order to cut the Sixth District's minus deficiency to 37,-745.
The Fourth District had a 418,981 population under the 1961 Act. The 1965

shift of Kansas City wards to the Fifth District further depleted the Fourth's assigned population. The 1965 Act therefore also shifted rural Barton County, population 11,113, from the Seventh District to the Fourth District with the total result that the Fourth District's 13,000 minus deficiency was increased from 13,-000 to 29,168 and the Seventh District, from which Barton County was taken, became another rural district in the 1965 redistricting with a population below the ideal average of 431,981 population.

notice, makes clear that the 1965 Missouri General Assembly understood how the State of Missouri could have been divided into ten congressional districts in which, as nearly as practicable, one man's vote in a congressional election would have been worth the same as another's. It is most significant to note that Senate Bill No. 320, after it had been amended, and as it was finally passed and approved, reflected the slighest degree of correction of the constitutionally void 1961 Act of any of the versions of that bill that were before the Seventy-third General Assembly as it considered congressional redistricting in 1965.

Introductory and Caveats in regard to Discussion of Particular Legislative Alternatives and Population Figures

■ Before discussing the legislative history of Senate Bill No. 320, we make clear that such discussion is not to be construed by a future Missouri General Assembly as any intimation by this Court that, had the Senate Committee Substitute for Senate Bill No. 320, for example, become the law of Missouri, the redistricting plan there proposed would have been held to be not unconstitutional by this Court. The purpose of our discussion is not to discuss the constitutionality of the available alternatives the 1965 General Assembly refused to enact; we discuss the alternatives rejected by the 1965 Missouri General Assembly to illustrate the fact that no practical reason existed to prevent the 1965 General Assembly from discharging its constitutional duties in regard to congressional redistricting imposed by both the 1945 Constitution of Missouri and by Art. I, § 2 of the Constitution of the United States.

■ The duty of establishing constitutional congressional districts for Missouri rests primarily upon the General Assembly of Missouri. Both the State and Federal Constitutions so provide. We reiterate that our discussion of the rejected proposals is not to be construed in any way as an implied recommendation of any particular plan or as an approval or recommendation that the only way congressional district lines should be drawn is for a future General Assembly to follow county lines except where forced by a distribution of population to do otherwise. We refrain totally from invading the legislative province of the General Assembly of Missouri. It is quite enough for this Court to discharge its duty of determining whether the 1965 Missouri Act is or is not unconstitutional.

Senate Bill No. 320
As Originally Introduced

Table III below illustrates the Congressional districting originally proposed by Senate Bill No. 320 when it was introduced on March 4, 1965. The first column sets forth the population allocations made by the constitutionally void 1961 Act. The second column sets forth the population proposed by the original version of Senate Bill No. 320 as calculated from the 1960 census figures in evidence. The third column sets forth the particular counties, townships, and wards that Senate Bill No. 320 proposed to be included in each particular congressional district. The last two columns afford a comparison of the deviations eventually created by the 1965 Act as it was ultimately passed, with the deviations that would have been created had the 1965 General Assembly passed Senate Bill No. 320 as it was originally introduced.

Table III is as follows:

TABLE III

SENATE BILL NO. 320 AS ORIGINALLY INTRODUCED

Comparison of Changes Proposed with Final Enactment

| DIST. NO. | POPULATION UNDER 1961 ACT | PROPOSED POPULATION | COMPOSITION OF DISTRICTS UNDER ORIGINAL S.B. 320 | DEVIATION UNDER 1965 ACT | DEVIATION UNDER PROPOSAL |
|---|---|---|---|---|---|
| 1 | 466,482 | 443,399 | Florissant, St. Ferdinand, Normandy and Washington Townships in St. Louis County; Wards 1 to 5 and 19 to 23, St. Louis City | +42,913 | +11,418 |
| 2 | 506,854 | 444,934 | Airport, Midland, Creve Coeur, Clayton, Hadley, Jefferson, Lincoln, Gravois, Bonhomme, Meramec, Concord and Lemay Townships in St. Louis County | +28,519 | +12,953 |
| 3 | 480,222 | 460,828 | Wards 6 to 18 and 24 to 28 in St. Louis City | +37,906 | +28,847 |
| 4 | 418,981 | 426,995 | Wards 14, 17, 23 and part of 24 in Kansas City, remainder of Jackson County and Counties of Cass, Bates, Vernon, Lafayette, Johnson, Henry and Pettis | —13,000 | —4,986 |
| 5 | 378,499 | 426,608 | Wards 1 to 16, 18 to 22 and part of 24 in Kansas City and a portion of Jackson County | —26,201 | —5,373 |
| 6 | 388,486 | 406,456 | Counties of Atchison, Holt, Nodaway, Andrew, Buchanan, Platte, Worth, Gentry, De Kalb, Clinton, Clay, Harrison, Daviess, Caldwell, Ray, Mercer, Grundy, Livingston, Carroll, Chariton and Linn | —37,745 | —25,525 |
| 7 | 436,933 | 422,750 | Counties of Barton, Jasper, Newton, McDonald, Cedar, Dade, Lawrence, Barry, St. Clair, Benton, Hickory, Polk, Greene, Christian, Stone, Taney, Dallas, Webster, Douglas and Ozark | —6,161 | —9,231 |
| 8 | 452,385 | 434,381 | Counties of Cooper, Morgan, Moniteau, Miller, Camden, Saline, Howard, Boone, Cole, Maries, Pulaski, Phelps, Laclede, Texas, Shannon, Dent, Reynolds, Carter, Iron, Crawford, Washington and Jefferson | +11,765 | +2,400 |
| 9 | 409,360 | 439,673 | Counties of Putnam, Sullivan, Schuyler, Scotland, Clark, Adair, Knox, Lewis, Macon, Shelby, Marion, Randolph, Monroe, Ralls, Audrain, Pike, Callaway, Montgomery, Lincoln, Warren, St. Charles, Gasconade, Franklin and Osage | +19,911 | + 7,692 |
| 10 | 381,602 | 413,789 | Counties of St. Francois, Ste. Genevieve, Perry, Cape Girardeau, Bollinger, Madison, Wayne, Stoddard, Scott, Mississippi, New Madrid, Pemiscot, Dunklin, Butler, Ripley, Oregon, Wright and Howell | +41,741 | —18,192 |
| TOTALS | 4,319,813 | 4,319,813 | | | |

It takes but a glance at Table III to understand that had the 1965 Missouri General Assembly passed Senate Bill No. 320 as it was originally introduced, it would have adopted a plan of congressional redistricting more closely in accord to the equal population principle than the bill eventually enacted.

It should, of course, be noted that the same general pattern of undervaluation and underweighting of the votes in the areas of urban population was apparent in original Senate Bill No. 320. But it is also obvious that the extent of over-valuation and overweight given the votes in the areas of rural population was far less drastic in Senate Bill No. 320 as originally introduced than that which resulted from the 1965 General Assembly's final action.[6]

### Senate Committee Substitute for Senate Bill No. 320

On March 11, 1965, the Senate Committee to which original Senate Bill No. 320 had been referred adopted and recommended the passage of a Senate Committee Substitute for Senate Bill No. 320.

Table IV reflects the action proposed by that Senate Committee Substitute. There is not sufficient data in the record to calculate the exact population allotted to the First, Second, or Third Districts in St. Louis or in the adjoining Ninth District because the Senate Committee's Substitute bill split wards and townships by assigning particular precincts to each of those four districts. The census figures in evidence are not broken down on a precinct basis. Total populations are therefore combined.

The population figures for the Fourth and Fifth Districts are also combined, because new and additional wards were created in Kansas City subsequent to the 1960 census, and the current population figures for those wards are not in evidence.

6. Although it is a well known fact that the population trends in Missouri, like most other States in the United States, continue to reflect population gains in urban areas and population losses in rural areas, we believe and find that the use of the 1960 census figures are the most practicable set of figures for use both by the Missouri Legislature and by this Court because they are the only available complete population figures upon which either legislative or judicial judgment may be predicated.

We make this finding in spite of the fact that between 1950 and 1960, except for counties that adjoin either Jackson County in which Kansas City is located, and those counties that adjoin St. Louis County, only twenty of Missouri's 114 counties that lie outstate showed gains in population; and that in 10 of those 20 outstate counties, the gain was less than 1,000. We have also considered the fact that, for a detailed example, the population loss between 1950 and 1960 in the 1965 Tenth District, to which the smallest population of only 390,240 was assigned, had a total net loss of 34,705 between 1950 and 1960, in spite of the fact that three counties located in that district under both the 1961 and 1965 Acts registered modest population gains. We base our finding in this regard on the fact that Article 3, Section 45 of the Missouri Constitution requires congressional redistricting after each national census in accordance with those figures and upon our conviction that there is no other practicable method available for use by the Missouri Legislature to make appropriate adjustment to catch up with the known but unascertainable trends of population shifts.

See copy of Plaintiffs' Exhibit No. 4 in the Appendix B for further information in regard to population gains and losses.

Table IV is as follows:

TABLE IV

SENATE COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 320

Comparison of Changes Proposed with Final Enactment

| DIST. NO. | POPULATION UNDER 1961 ACT | PROPOSED POPULATION | COMPOSITION OF DISTRICTS UNDER S.C.S. FOR S.B. 320 | DEVIATION UNDER 1965 ACT | DEVIATION UNDER PROPOSAL |
|---|---|---|---|---|---|
| 1 | 466,482 | 435,383 [1] | Normandy, St. Ferdinand, Washington Townships and particular precincts in Airport Township in St. Louis County. Wards 1 through 5, inclusive, 20 through 22, inclusive, and 27 in St. Louis City | +42,913 | + 3,402 [2] |
| 2 | 506,854 | 435,383 [1] | Creve Coeur, Hadley, Lincoln, Jefferson, Clayton, Gravois, Concord, Lemay Townships and particular precincts in Bonhomme Township in St. Louis County. Ward 12 and part of precincts 16 through 36, inclusive, Ward 23 in St. Louis City | +28,519 | + 3,402 [2] |
| 3 | 480,222 | 435,383 [1] | Wards 6 through 11, inclusive, 13 through 19, inclusive, 24 through 26, inclusive, 28, and particular precincts in Ward 23 in St. Louis City | +39,906 | + 3,402 [2] |
| 4 | 418,981 | 421,081 [3] | Wards 23 and 24 in Kansas City and Washington, Blue, Brooking, Fort Osage, Van Buren, Prairie and Sni-A-Bar Townships in Jackson County, and Counties of Lafayette, Cass, Johnson, Pettis, Henry, Bates, Vernon, St. Clair, Saline and Barton | —29,168 | —10,900 [4] |
| 5 | 378,499 | 421,081 [3] | Wards 1 through 20, inclusive, and Ward 22 in Kansas City | —26,201 | —10,900 [4] |
| 6 | 388,486 | 442,253 | Counties of Atchison, Holt, Nodaway, Andrew, Buchanan, Platte, Worth, Gentry, DeKalb, Clinton, Clay, Harrison, Daviess, Caldwell, Ray, Mercer, Grundy, Livingston, Carroll, Chariton, Linn, Sullivan, Randolph and Putnam | —37,745 | +10,272 |
| 7 | 436,933 | 417,399 | Counties of Jasper, Newton, McDonald, Cedar, Dade, Lawrence, Barry, Benton, Hickory, Polk, Greene, Christian, Stone, Taney, Dallas, Webster, Wright, Douglas and Ozark | — 6,161 | —14,582 |
| 8 | 452,385 | 438,253 | Counties of Howard, Cooper, Morgan, Camden, Laclede, Boone, Moniteau, Cole, Miller, Pulaski, Texas, Osage, Maries, Phelps, Gasconade, Crawford, Dent, Franklin and Jefferson | +11,765 | + 6,272 |

| | | | | | Counties |
|---|---|---|---|---|---|
| 9 | 409,369 | 435,383 [1] | +19,911 | + 3,402 [2] | Counties of Schuyler, Adair, Macon, Scotland, Knox, Shelby, Monroe, Audrain, Callaway, Clark, Lewis, Marion, Ralls, Pike, Lincoln, Montgomery, Warren, St. Charles, and Florissant, Meramec, Midland and particular precincts in Airport and Bonhomme Townships in St. Louis County. |
| 10 | 381,602 | 438,214 | −41,741 | + 6,233 | Counties of Howell, Shannon, Oregon, Washington, Iron, Reynolds, Carter, Ripley, St. Francois, Madison, Wayne, Butler, Ste. Genevieve, Perry, Bollinger, Stoddard, Dunklin, Cape Girardeau, Scott, Mississippi, New Madrid and Pemiscot |
| TOTALS | 4,319,813 | 4,319,813 | | | |

[1] The total population of the geographical area included in the First, Second, Third and Ninth Districts is 1,741,532. One-fourth is assigned each district.

[2] One-fourth of total deviation between four ideal districts (1,727,924) and actual population (1,741,533) of area covered by the four districts.

[3] One-half of total population assigned Fourth and Fifth Districts.

[4] One-half of total deviation between two ideal districts of 863,962 and actual population of 842,162.

Table IV illustrates that it was entirely practicable for the 1965 Missouri General Assembly to have redistricted the State of Missouri with deviations from an ideal average district under a plan that would have produced variances of less than 15,000 for all of the districts. That table also illustrates the fact that the Senate Committee that proposed its Substitute for Senate Bill No. 320 clearly understood the method under which the outstate districts could be assigned sufficient geographical area to produce an infinitely smaller deviation for those districts than was accomplished by the 1965 Missouri General Assembly.

### Summary of Remaining Legislative History in regard to Senate Bill No. 320

On March 18, 1965, House Bill No. 710 was introduced and read for the first time in the Missouri House of Representatives. That bill proposed only minor changes in regard to only the Second and Ninth Districts. House Bill No. 710 proposed only to shift some of the 1961 excess 74,872 population of the Second District to the Ninth District.

The Missouri Senate perfected its Senate Committee Substitute for Senate Bill No. 320 on May 11, 1965 and on May 19, 1965, the Senate adopted that bill. On the same day, the House received that bill from the Senate and had it read for the first time. On May 25, 1965, the House referred the adopted Senate bill to the House Comittee on Congressional Redistricting. The House passed its own bill on June 23, 1965, and Conference Committees were therefore appointed by both the House and the Senate on June 28, 1965.

Two days later, on June 30, 1965, and on the last day of the regular session, the conference committee reported a Conference Committee Substitute for House Committee Substitute for Senate Committee Substitute for Senate Bill No. 320. The bill recommended by the Conference, despite constitutional objections that day filed, was passed just before the midnight mandatory adjournment deadline of the Seventy-third General Assembly's 1965 session.

On July 15, 1965, the presiding officers of both houses, again despite the filing of constitutional objections, signed the bill that became the law of Missouri when signed and approved by the Governor on August 5, 1965.

### Detail of Constitutional Objections Filed Before Passage of C.C.S. H.C.S. S.C.S. S.B. 320

The House Journal of the 1965 Missouri General Assembly shows that when the report of the Conference Committee was presented to the House, five Representatives offered constitutional objections to the Conference Committee Substitute for House Committee Substitute for Senate Committee Substitute for Senate Bill No. 320. The constitutional objections read as follows:

We, the undersigned Representatives, hereby offer the following constitutional objections to CCS for HCS for SCS for Senate Bill 320 as adopted and passed:

(1) The districts set up therein are not within the population limitations set out in the federal court order requiring redistricting.

(2) The difference in population between the largest and smallest district is 84,709—the largest district being 21.7% larger than the smallest district.

(3) The first district is 9.9% above the mean of 431,981 and the ten [sic] district is 9.7% below the mean. Three other districts are more than eight percent off from the mean.

(4) The districts are not as compact and nearly equal in population as possible. The chairman of the House Redistricting Committee stated that the policy was established to stay within an arbitrary figure of 10% above and below the mean.

We think it not without significance that members of the 1965 Missouri General Assembly directed the attention of that legislative body to its constitutional duties under both the State and Federal Constitutions immediately before that body passed the 1965 Act. Our decision in this case, of course, does not rest on whether or not, in fact, the chairman of the House Redistricting Committee, or any other member or members of the 1965 General Assembly did or did not establish a policy "to stay within an arbitrary figure of 10% above and below the mean," as stated in the constitutional objections just quoted.

The only constitutionally permissible policy that could have been followed by the 1965 Missouri General Assembly is that set forth in Art. I, § 2 of the Constitution of the United States, as that section has been defined by the Supreme Court of the United States in Wesberry v. Sanders.

We turn now to the legal contentions of the parties.

### Plaintiffs' Legal Contentions

Plaintiffs contend that Art. I, § 2, of the Constitution of the United States, as construed in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and as applied by this Court in *Preisler I,* is controlling. Anticipating defendants' and intervenors' argument, plaintiffs suggest that "one must be aware of and draw careful distinctions between * * * cases on congressional representative districting under the provisions of Article I, Section 2 of the United States Constitution and the cases * * * on the apportioning of the houses of a State legislature under the provisions of the fourteenth amendment to the United States Constitution."

### Defendants' Legal Contentions

Defendants concede that Wesberry v. Sanders and *Preisler I* "set forth the law of this case" but they attempt to sustain the constitutionality of the 1965 Act by reliance upon cases determining the validity or invalidity of State reapportionments attacked under the Equal Protection Clause of the fourteenth amendment and by reliance upon particular three-judge congressional apportionment cases that apply the rules of decision applicable to State apportionment cases. Defendants argue that the rules of decision announced in these cases have established "specific guide lines or yardsticks" that are applicable to a congressional districting case. Defendants elaborate their argument by presenting a variety of mathematical formulae relating to (a) the percentage variation of the districts from an average or ideal district; (b) to the ratio between the most populous district and the least populous district; and (c) to the mathematical fraction or percentage of congressional district population to the State population. Mathematical tables are included in defendants' brief in which the actual population variances are stated in smaller mathematical percentages or ratios.

In their conclusion defendants again concede that "the issue before the court is whether the Missouri congressional districts are apportioned so that one man's vote for representatives in Congress is as nearly as practicable worth as much as another man's vote." Defendants also concede, as they must, that inequality of population does in fact exist in Missouri's 1965 redistricting plan. Defendants, however, argue that only "substantial" equality of population is constitutionally required and that such equality may be established by an application of the various mathematical computations set forth in their brief. Further and most importantly, defendants make the firm admission in their brief that "population alone was [not] the only factor considered by the legislature in the congressional apportionment."

The reason defendants conceded in their written brief that factors in addition to population had in fact influenced the establishment of the districts created under the 1965 Act was made apparent at oral argument. The Assistant Attorney General representing defendants stated that "if you were looking at population as being the sole factor, the only

factor that could be considered, \* \* \* I would have to immediately confess \* \* that you would probably have to get within a one percent variation in order to say that you have met the population factor, if that is your sole factor."

When asked whether he "read the *Wesberry* case as saying that other factors than population are to be considered in congressional redistricting," defendants' counsel stated: "That is my understanding of the *Wesberry* case."

In response to a comment from the Bench that "you have stated very flatly that should this court rule as a matter of law that population is the single factor, you concede that the redistricting would be void," the Assistant Attorney General stated:

I would concede that, yes, Judge; that if population is the sole factor, then I think that this plan with deviations approximating ten percent up and down would be void.[7]

█ It is therefore apparent that defendants' basic contention rests upon the validity of their argument that Wesberry v. Sanders permits State legislative bodies to consider factors other than population alone in discharge of the constitutional command of Art. I, § 2, of the Constitution that congressional districts be of as nearly equal population as is practicable. We hold that argument is not tenable for the reasons we shall later state.

### Intervenors' Legal Contentions

Intervenors attempt to escape the controlling effect of Wesberry v. Sanders in an apparently different manner. In substance, however, the argument is the same as that presented by defendants. Intervenors argue that the Supreme Court "appraised its holding in *Wesberry*" when it stated on page 559 of 377 U.S. on page 1380 of 84 S.Ct. 12 L.Ed.2d 506 of Reynolds v. Sims, that "We determined [in Wesberry v. Sanders] that the constitutional test for the validity of congressional districting schemes was one of *substantial* equality of population among the various districts \* \* \*." (Emphasis the intervenors'.)

The words "substantial equality" are lifted from the quoted sentence of Reynolds v. Sims and utilized by the intervenors to form the major premise of their basic argument. Intervenors rely upon the same line of State apportionment cases that defendants rely on and, in turn, present their share of mathematical computations in support.

Intervenors' effort to convert the words "substantial equality" from the single sentence in Reynolds v. Sims into a talisman that would negate the controlling impact of Wesberry v. Sanders is defeated by decisive language in Reynolds v. Sims itself. On page 560 of 377 U.S., on page 1381 of 84 S.Ct., Mr. Chief Justice Warren pointed out neither Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), nor Wesberry v. Sanders were either "dispositive of or directly controlling on our decision in these cases involving state legislative apportionment controversies". Further, the Chief Justice stated that "those decisions \* \* \* held that, in statewide and in congressional elections, one person's vote

---

7. Defendants' counsel referred to factors other than population which he suggested could have properly been and, by implication, were in fact considered by the Missouri General Assembly in connection with the 1965 Act. Those factors were described as "political," "economic," "history and tradition and what not." Defendants' counsel argued that "the political factors and the economic factors and the historical factors that are brought to bear" on the members of the General Assembly made the discharge of that legislative body's dual constitutional duty a difficult task. Defendants' counsel stated that "I support the plan as being a practical one worked out in the ambit of politics. \* \* \* I go a step further and concede that this is a border line case." This Court was urged "for the sake of political stability to leave the districts undisturbed until 1971."

must be counted equally with those of all other voters in a State * * *." He added most significantly that those decisions "were based on different constitutional considerations [than were involved in Reynolds v. Sims] and were addressed to rather distinct problems" 377 U.S. at 560, 84 S.Ct. at 1381. The Chief Justice stated that "our decision in *Wesberry* was of course grounded on that language of the Constitution which prescribes that members of the Federal House of Representatives are to be chosen 'by the People,' while attacks on State legislative apportionment schemes, such as that involved in the instant cases, are principally based on the Equal Protection Clause of the fourteenth amendment" 377 U.S. at 560, 84 S.Ct. at 1381.

Wesberry v. Sanders was again specifically and definitely referred to in Reynolds v. Sims in section VI of that opinion which commenced on page 577 of 377 U.S., on page 1389 of 84 S.Ct. Again, describing what had been determined in Wesberry v. Sanders, the Supreme Court held:

> In Wesberry v. Sanders, supra, the Court stated that congressional representation must be based on population as nearly as is practicable. In implementing the basic constitutional principle of representative government as enunciated by the Court in *Wesberry*—equality of population among districts—some distinctions may well be made between congressional and state legislative representation. (377 U.S. at 577–578, 84 S.Ct. at 1390).

After noting that almost invariably a larger number of seats are distributed for State legislative bodies than for congressional seats, the Supreme Court add-

ed that "[s]omewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting." 377 U.S. at 578, 84 S.Ct. at 1390.

Intervenors, of course, do not spell out the necessary steps that must be taken to reach the conclusion that the rules of decision applicable to the State apportionment cases be applied to this congressional districting case. At oral argument intervenors indicated their disagreement with and rejection of defendants' argument that Wesberry v. Sanders did not hold what it does in fact hold.

In that regard intervenors' counsel stated that he did "not agree with the Attorney General in two respects."

Intervenors' counsel added that "the way I read the *Wesberry* case; population is the only thing that can be considered * * * population is the only factor."[8]

The intervenors and the defendants were equally disinterested in what factors other than population were taken into account by the 1965 Missouri General Assembly. Counsel did not attempt to suggest any reason why it was not practicable to avoid variances, for example, of something over 84,500 between the First and the Tenth Districts. When asked for some explanation as to "why there was not a closer approximation to the ideal," counsel for the intervenors stated that he knew of none other than that intimated by the Assistant Attorney General—that the scheme "was the best that could be gotten under the practical political circumstances." Counsel added that "I haven't examined any records of the legislature. I don't know that there are any to examine. I haven't inquired."

---

8. Intervenors stated their second disagreement with defendants by saying "I also do not agree with the Attorney General in his concession that our Act is bad when that [population alone] is the only factor considered, and I don't see how this conclusion can be reached in light of the cases that have been decided by the other three-judge courts around the country. * * *"

It perhaps should be added that a third area of disagreement exists between the intervenors and the defendants. Defendants concede that, at best, this is a "border line" case. Intervenors, on the other hand, argue that "the Missouri factual situation does not present even a close question."

In the face of such total disinterest to present any factual base to support their requested finding that the 1965 General Assembly had complied with the mandates of both the Constitutions of Missouri and of the United States, intervenors nevertheless contend that "there is not one fact before this Court, nor of which this Court may take judicial notice, indicating any motive or consideration other than 'as nearly as is practicable' obtaining equality by the legislative process." We hold that intervenors' arguments are untenable for the same reasons that defendants' may not be sustained.

We turn now to the detailed answers to the basic arguments presented by both the defendants and the intervenors.

## The Constitutional Standard of Art. I, § 2 Applicable to Congressional Representation Is Population Alone

In Wesberry v. Sanders the Supreme Court noted that for over thirty years there had never been any question about the power and the duty of a federal court to exercise jurisdiction in cases involving Congressional redistricting.[9]

The constitutional standard against which Missouri's 1965 Congressional Redistricting Act must be measured was definitively established by Wesberry v. Sanders. The Supreme Court there stated: "We hold that, construed in its historical context, the command of Art. I, § 2 * * * means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." (l. c. 7–8 of 376 U.S. 530 of 84 S.Ct., 11 L.Ed.2d 481.) The Supreme Court repeatedly emphasized that population was to be the sole factor to be considered in Congressional reapportionment cases. On pages 8 and 9 of 376 U.S., on page 530 of 84 S.Ct. it held that "[t]he history of the Constitution, par-

ticularly that part of it relating to the adoption of Art. I, § 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives." And on page 13 of 376 U.S., on page 533 of 84 S.Ct. it was stated that "[t]he debates at the Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants." Again, on page 14 of 376 U.S., on page 533 of 84 S.Ct., it was stated:

It would defeat the principle solemnly embodied in the Great Compromise —equal representation in the House for equal numbers of people—for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater value in choosing a Congressman than others.

In Bush v. Martin, S.D.Tex.1963, 224 F.Supp. 499, decided before Wesberry v. Sanders, Judge John R. Brown contrasted "the problem [of congressional redistricting] with that of the composition of State Legislatures" (224 F.Supp. at 511). Reasoning from Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed. 2d 821 (1963), and Scholle v. Hare, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1 (1962), Judge Brown suggested that "[t]he present indications are that considerable leeway must be allowed the States in the diffusion of its political initiative" (224 F.Supp. at 511). As to the different question of congressional representation, and with specific reliance upon Art. I, § 2 and the history of the Great Compromise as set forth in Warren, The Making of the Constitution, 141, 159, 163, 220–312

9. As noted in footnote 1 above, the case of State ex rel. Carroll v. Becker, Secretary of State was decided on the merits by the Supreme Court of the United States in 1932. That case involved Missouri's Congressional redistricting that followed the 1930 United States census and ordered that the 1932 Congressional elections in Missouri be held at large.

(1927), and Padover, To Secure These Blessings, 152–88, 285–301 (1962), Judge Brown, in anticipation of what was later held in Wesberry v. Sanders, stated at 511:

> But here we deal with a legislative assembly which, by the Constitution and because of the Great Compromise giving rise to that Constitution, is to bear a direct relation to population, and, at least as between the States, population only. * * * The simple constitutional fact is that so far as (a) the standard of composition of the Congress is concerned, as distinguished perhaps from (b) the standard governing the time and circumstance permitting or requiring judicial intervention, Members of Congress are to be elected on the basis of population and nothing else.

The validity of Judge Brown's definitive holding that the standard of congressional districting was .population alone was sharply contested by Judge James L. Noel, Jr., in his dissenting opinion. See page 519 of 224 F.Supp. Judge Noel there italicized that portion of Judge Brown's opinion that stated "*Members of Congress are to be elected on the basis of population and nothing else*" in order that precise attention be focused upon the point of judicial disagreement.

Judge Brown was affirmed and Judge Noel's dissent was rejected by the Supreme Court's affirmance of Martin v. Bush, on March 2, 1964 by per curiam opinion reported in 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656, on the authority of Wesberry v. Sanders, which had been decided two weeks earlier on February 17, 1964.

On the same day that Wesberry v. Sanders was decided, the Supreme Court also decided Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), where an attack was made on the congressional districting of the State of New York under the Equal Protection Clause of the fourteenth amendment. Mr. Justice Black, also the author of Wesberry v. Sanders, affirmed the district court's finding that the Equal Protection Clause had not been violated, and, noting the same basic distinction that Judge Brown had noted in Bush v. Martin, further stated:

> We do not pass on the question * * * not presented here, that is, whether the state apportionment is constitutionally invalid because it may fail in its objective to create districts based as nearly as practicable on equal population. See Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526. Since no such challenge has been urged here, the issues have not been formulated to bring it into focus, and the evidence has not been offered or appraised to decide it, our holding has no bearing *on that wholly separate question.* 376 U.S. at 58, 84 S.Ct. at 606. (emphasis ours).

That the question presented by an attack under Art. I, § 2 is a "wholly separate question" from that presented by an attack under the Equal Protection Clause of the fourteenth amendment was also emphasized in Wesberry v. Sanders itself. In footnote 10 on page 8 of 376 U.S., on page 530 of 84 S.Ct., Mr. Justice Black held that because Wesberry v. Sanders was decided under Art. I, § 2, "[w]e do not reach the arguments that the Georgia statute violates the Due Process, Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment."

We do not share the surprise some commentators have noted that the Supreme Court applied Art. I, § 2 to congressional redistricting instead of considering the Equal Protection Clause of the fourteenth amendment as the only clause under which the validity of a congressional redistricting plan could be tested.[10]

---

10. See, for example, pages 90–91 of Robert B. McKay: "Reapportionment—The Law and Politics of Equal Representation," Twentieth Century Fund Study (1965), where it was stated: "The surprise in *Wesberry* was not on the justiciability issue, which was hardly difficult to predict, * * *. The surprise was rather that six members of the Court concluded that their authority for the invalida-

Almost a hundred years ago, in times more politically troubled than our own, the Supreme Court laid the foundation upon which Wesberry v. Sanders is based. In Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), Mr. Justice Miller, speaking for a unanimous court, answered the argument that "the right to vote for a member of congress is not dependent upon the constitution or laws of the United States, but is governed by the law of each state respectively", 110 U.S. at 662–663, 4 S.Ct. at 157–158. That case held that "it is not correct to say that the right to vote for a member of congress does not depend on the constitution of the United States" (110 U.S. at 663, 4 S.Ct. at 158). Article I, Section 2 was specifically identified as the controlling provision of the Constitution and, after quoting that section, the Supreme Court explained that "[t]he States, in prescribing the qualifications of voters for the most numerous branch of their own legislatures, do not do this with reference to the election for members of Congress * * * They define who are to vote for the popular branch of their own legislature, and the constitution of the United States says the same persons shall vote for members of Congress in that State" (110 U.S. at 663, 4 S.Ct. at 158). "It is not true," Mr. Justice Miller held in conclusion, "that electors for members of congress owe their right to vote to the state law * * *." (110 U.S. at 663, 4 S.Ct. at 158).

Mr. Justice Stone added over a quarter of a century ago in United States v. Classic, 313 U.S. 299, at 314, 61 S.Ct. 1031, at 1037, 85 L.Ed. 1368 (1941) that "Section 2 of Article I commands that Congressmen shall be chosen by the people of the several states". He noted on page 315, 61 S.Ct. on page 1037: that "[w]hile, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states * * * this statement is true only in the sense that the states

are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, * * *". Ex parte Yarbrough was among the cases cited and relied upon.

Most important for our present discussion, Mr. Justice Stone emphasized in *Classic* that the protection of a citizen's right to vote in a federal election was entirely separate from the protection of his right to vote in a State election. The separate rights are protected by entirely different constitutional provisions. "[S]ince the constitutional command [of Art. I, § 2] is without restriction or limitation," Mr. Justice Stone held, "the right, *unlike those guaranteed by the Fourteenth and Fifteenth Amendments,* is secured against the action of individuals as well as of states" (313 U.S. at 315, 61 S.Ct. at 1038, emphasis ours).

Plaintiffs in this case seek to protect their rights as conferred by Art. I, § 2 to vote in a federal election. The question of whether those rights have in fact been abridged must be adjudicated under the cases applicable to that question and not under Equal Protection Clause rules applicable to abridgments of their wholly separate right to vote in State elections, which are, to use the words of *Classic* in 1941, "unlike those guaranteed" by Art. I, § 2, or to use the more recent words of Wright v. Rockefeller, supra, which present a "wholly separate question" (376 U.S. at 58, 84 S.Ct. 603, 11 L.Ed.2d 512).

Both *Ex parte Yarbrough* and *Classic* were cited and relied upon by Mr. Justice Black both in his dissent in Colegrove v. Green, 328 U.S. 549 at 570, 66 S.Ct. 1198, at 1211, 90 L.Ed. 1432 (1946), and in his opinion in Wesberry v. Sanders, 376 U.S. at 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). In his *Colegrove* dissent he stated that "Article I provides that Congressmen 'shall be * * * chosen * * * by the People of the several States' ", and, specifically in re-

tion of the congressional districting plan in Georgia stemmed from article I, section 2 of the Constitution and not from

the equal protection clause of the fourteenth amendment."

liance upon Ex parte Yarbrough, held that Article I "thus gives those qualified a right to vote and a right to have their vote counted" (328 U.S. at 570, 66 S.Ct. at 1210).

Almost twenty years before Wesberry v. Sanders was decided, Mr. Justice Black precisely stated in his dissent in *Colegrove* that Art. I, § 2 requires a State legislature to establish Congressional districts under which *"so far as feasible,* votes be given equally effective weight" (328 U.S. at 571, 66 S.Ct. at 1211). Earlier on that same page the same thought was expressed by use of the words "to the extent that it is *practically feasible* [all citizens shall] be given equal representation."

The words "so far as feasible" and the words "practically feasible" in Mr. Justice Black's *Colegrove* dissent expressed the same idea that became the supreme law of the Land when Wesberry v. Sanders held that Art. I, § 2 must be taken to mean that congressional districts must be of equal population *"as nearly as is practicable."*

After Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), had been decided we do not believe anyone should have been surprised that the dissents in earlier apportionment cases, both congressional and State, would be adopted as the rule of the Supreme Court in cases decided after that landmark case.[11]

■ The basic constitutional principle of equal representation established by Art. I, § 2 forbids and eliminates, so far as congressional representation is concerned, the consideration of any factor other than population. Use of such words as "feasible" and "practicable" in a careful statement of the fundamental constitutional principle constitutes but a recognition that the familiar

doctrine of *de minimis* is applicable and is designed to make clear that a State legislature would not be expected to create entirely new political subdivision lines in order to have absolute and precise mathematical equality in its congressional districts.

Various courts other than the Supreme Court have stated the basic constitutional principle of equal representation applicable to congressional districting in words as unequivocal as those used repeatedly in Wesberry v. Sanders.

For example, Calkins v. Hare, E.D. Mich.1964, 228 F.Supp. 824 at 829, in which it was held that "[o]ne factor and one alone is controlling, the factor of population." Meeks v. Anderson, D. Kan.1964, 229 F.Supp. 271 at 273, held that "one factor, and only one, may be taken into account in apportioning and establishing the congressional districts among the people of a state and that factor is population." And Bush v. Martin, supra, subsequently affirmed by the Supreme Court, in addition to what has already been quoted, stated the applicable constitutional principle still another way: "Members of Congress are to be elected on the basis of population and nothing else" (224 F.Supp. at 511).

Rejection of Mathematical Arguments

The concept that population and population alone is the sole standard for congressional representation requires that acceptance of invitations to examine population deviations and variations in terms of stated mathematical formulae be limited to discussion of such matters only as they may tend to illuminate the factual situation presented in a particular case.

When legal arguments are based on the theory that a particular congressional districting scheme is only slightly unconstitutional and should be sustained

11. See and compare the pattern, for example, of Reynolds v. Sims in which Mr. Justice Douglas' dissent in South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834 (1950), was expressly adopted in footnote 29 at page 555 of 377 U.S., at page 1378 of 84 S.Ct., 12 L.Ed.2d 506, and in which another portion of Mr. Justice Black's *Colegrove* dissent was expressly adopted in footnote 40 at page 563 of 377 U.S., at page 1382 of 84 S.Ct.

because the votes of the population of a particular district are, in fact, overvalued and overweighted by "only" a plus 9.9% deviation and a minus 9.6% deviation, to use the figures involved in this case, such arguments should be, and are in this case, firmly rejected.

"We do not propose," to use the words of Judge Talbot Smith in Calkins v. Hare, "to be drawn into a sterile controversy over averages and percentages, whether 9%, 15% or other" (228 F. Supp. at 828). Judge Smith added that the "as nearly as practicable" words of Wesberry v. Sanders can not be utilized as "an escape hatch for the reluctant" (228 F.Supp. at 829).

We believe that Calkins v. Hare correctly put its finger on the reason why a numbers game cannot be played in ruling the legal questions presented in a congressional redistricting case. That case held:

> We do not measure constitutional rights in these terms. They set up wholly false standards. That the average man gets due process in our courts does not justify railroading some luckless scoundrel every now and then. Nor is it an answer to a charge of unconstitutional disfranchisement that only 10,000 people are deprived of their right to vote, this being but a small percentage of the entire voting population. These 10,000 have a right to vote equally with others, no matter what percentage of the total they comprise. We take this to be as clear as the proposition that none of our people can be denied their free right of worship no matter how small the sect, and that none of our people shall be deprived of their right of free speech, no matter how obnoxious to most of us their doctrines (228 F. Supp. at 828).

"The short of the matter," to borrow further the words of Calkins v. Hare, "is that a citizen can either vote equally with his peers or he cannot." "If he cannot," that case continued, "and we find he cannot with respect to congressional elections in Michigan, his constitutional rights have been abridged" and the statute must be held to be unconstitutional. 228 F.Supp. at 828.

We make the same finding and holding with respect to congressional elections in Missouri under the 1965 Act. We refuse to hold that the constitutional right of equal representation may be but slightly, and therefore permissibly, abridged on the theory that percentage figures and ratio numbers make unexplained and substantial population deviations and variances look smaller.

Any possible doubt that population and population alone is the sole standard for congressional redistricting was removed by recent Supreme Court cases dealing with North Carolina and Maryland congressional redistricting.

### North Carolina Congressional Redistricting Litigation

Two cases, both of which provide close parallels to *Preisler I* and *Preisler II* in this Court, were involved in the North Carolina congressional litigation.

The first case, Drum v. Seawell, M. D.N.Car.1965, 249 F.Supp. 877, as did the second, involved the constitutional validity of both the North Carolina legislative reapportionment and the congressional districts of that State. Both schemes of representation were held to be constitutionally impermissible on November 30, 1965. We focus attention only on the congressional redistricting portion of both cases.

The population figures set forth in the appendix of *Drum I* on page 882 of 249 F.Supp., demonstrate that the three-judge North Carolina court considered a factual situation quite like that presented this Court in *Preisler I*.[12] That

12. The deviation of 136,335 for North Carolina's First District was considerably greater than the 74,872 deviation of Missouri's 1961 Second District, but except for that difference, the deviation of all the other districts are quite comparable. Of course, the constitutional invalidity of both districting plans was apparent on their face.

court, solely on the authority of Wesberry v. Sanders, held in *Drum I* that the North Carolina congressional districts were constitutionally void.

Most significantly, that court held that "[n]o valid explanation is offered to justify these glaring discrepancies, if indeed they could be justified" (249 F. Supp. at 880). It also held that "[t]he plaintiff having proven his charge of discrimination on the basis of population by evidence to which the parties have stipulated, the burden was placed upon the defendants to justify the variations from this standard which were shown to exist. The defendants have failed to meet this burden and we are forced to the conclusion that the plaintiff and those in his class are entitled to relief" (249 F.Supp. 881). That court enjoined the holding of congressional elections under the constitutionally void redistricting plan.

Rehearing was denied by the North Carolina three-judge court on March 8, 1966. An immediate appeal was taken to the Supreme Court. On April 4, 1966, less than a month after the denial of rehearing, the Supreme Court decided Drum v. Seawell, 383 U.S. 831, 86 S. Ct. 1237, 16 L.Ed.2d 298. The complete opinion read:

The motion to advance and expedite consideration is granted. The judgment is affirmed.

The North Carolina Legislature met in special session and passed new schemes of representation for its own legislature and for congressional districts for the United States House of Representatives. In *Drum II* the validity of the new scheme of State representation was again attacked under the Equal Protection Clause of the fourteenth amendment and the validity of the Congressional redistricting was again attacked under Art. I, § 2. *Drum II* is reported as Drum v. Seawell, M.D.N.Car.1966, 250 F.Supp. 922. The 1965 North Carolina congressional plan involved in *Drum II* contained population variations and deviations that were, in point of fact, smaller than those contained in Missouri's 1965 plan presently under attack in *Preisler II*. In other words, we look at a case in which the plan held constitutionally void was a "better" plan than the plan involved in this case.[13]

Judge J. Spencer Bell, again writing for the same unanimous three-judge court that decided *Drum I*, noted in *Drum II*, as we note in *Preisler II*, that Reynolds v. Sims points out that "stricter adherence to equality of population between districts may more logically be required in congressional than in state legislative representation" (250 F.Supp. at 924). That court, as does this Court, took note of the fact that the 1965 North Carolina Legislature had rejected the recommendation of a Joint Select Committee of the 1965 North Carolina Legislature that had proposed a somewhat better plan than that eventually adopted.

That court determined that the 1965 North Carolina Legislature had been in fact influenced by "presumed minimum mathematical percentages" and that it also had been influenced by a "motive to retain incumbent congressmen" in their old districts (250 F.Supp. at 925).

That court, however, much as has this Court, found that "[i]t is not necessary to a decision of this case to determine

13. Footnote 4 on page 925 of 250 F.Supp. shows that the 1965 North Carolina Act had deviations that ranged from minus 8.91 to plus 8.39, as compared to the range in Missouri's 1965 Act of from minus 9.6 to plus 9.9. The greatest North Carolina population difference between its largest and its smallest district was 71,640; the comparable 1965 Missouri figure is 84,655. The variance between the largest Missouri district and the three smallest Missouri districts exceeded the maximum North Carolina figure. The variance between Missouri's second largest district and its second smallest district, the Third and the Sixth, respectively, was 75,652, a figure greater than North Carolina's maximum variation of 71,640. See Table II above for exact calculations.

whether a motive to retain incumbent congressmen is a legitimate consideration in redistricting" because "[t]he overemphasis on factors other than population has created excessive deviation from the standard * * * required" 250 F.Supp. at 924.

It is of greatest interest to note that the 1965 State legislative reapportionment plan was approved in *Drum II* at the same time the 1965 congressional redistricting was held to be constitutionally void.

The State reapportionment was approved in spite of the fact the population variances were greater than those involved in the congressional redistricting. In so doing, Judge Bell made clear that the criteria of judgment was different; that the constitutional standards applicable to two different types of cases were not the same; and that while particular "deviations and disparities render the [State] apportionment scheme of the two houses * * * 'constitutionally suspect', we cannot say that they constitute invidious discrimination" (250 F.Supp. at 924). The congressional redistricting, on the other hand, was held to abridge the Art. I, § 2 constitutional rights of equal congressional representation because more than *de minimis* population deviations in fact existed and because the fact that such deviations were smaller than those involved in the State apportionment was of no legal relevance.

We follow *Drum II*, not because the deviations involved in the 1965 Missouri Act are greater than those involved in the 1965 North Carolina Act, but because the rationale of *Drum II* is based upon the legal premise that population alone is the constitutional standard and that any variation above that permitted by a fair application of the doctrine of *de minimis*, factually supported, must be held to be an abridgment of rights guaranteed by Art. I, § 2 of the Constitution.

It is, of course, apparent that if the standards applicable to an Equal Protection Clause case announced in Reynolds v. Sims could have been said to be applicable to the North Carolina congressional redistricting case, the 1965 North Carolina Congressional Act would have been promptly approved for the obvious reason that, under the facts presented in *Drum II*, the population deviations and variances were *smaller* under the North Carolina congressional act than they were under the North Carolina State Legislature apportionment. Recognition by *Drum II* that it was deciding two very different types of cases prevented the confusion that has infrequently arisen in some of the three-judge congressional cases and in some of the congressional cases decided by particular State courts.

Maryland Congressional Redistricting

Difficulties with congressional redistricting in Maryland antedated the first of three reported federal court decisions in that State. In Maryland Citizens Committee for Fair Cong. Redist. Inc. v. Tawes, D.Md.1964, 226 F.Supp. 80, a three-judge court composed of Chief Circuit Judge Sobeloff, Chief District Judge Thomsen and District Judge Northrup accepted jurisdiction of the case on February 3, 1964. The per curiam opinion in that case held:

In our view the burden rests initially on the plaintiffs to show unconstitutionality, *but when the mathematical imbalance between districts is of sufficient magnitude the burden shifts to the defendants to justify the disparity.* Where the vote of a citizen in one district counts for significantly less than a vote in another district, as is manifestly now the case in Maryland, the disproportion rebuts the presumption of the constitutionality of the statute and requires the State to show that there is a rational basis for the disproportion. (Emphasis ours.)

Jurisdiction was retained to permit constitutional action by the Maryland Legislature. On March 21, 1964, the same court in another per curiam opinion reported in 228 F.Supp. 956 at 958,

signed a decree "declaring the existing congressional boundaries unconstitutional and void, but [stayed] the effective date of the decree until after this fall's [1964] elections."

The Maryland General Assembly did not even attempt to comply with its constitutional duty. The three-judge court was forced to act on May 3, 1966, after the April 6, 1966 adjournment of a special session of the Maryland General Assembly that failed to pass any new redistricting bill at all.[14]

In its third opinion in the same case, reported 253 F.Supp. 731, Chief Judge Sobeloff, for a unanimous court, on May 3, 1966, held:

> Chapter 371 of the Acts of 1965, in our opinion, deviates too widely from the constitutional norm of 'one man, one vote' to be tolerated.

In reliance upon *Drum II*, the Maryland three-judge court held:

> Even if a district plan initially comports with the one-to-one formula, discrepancies may be expected to arise with changing conditions. Such discrepancies are unavoidable and must be tolerated for a time, *till the next census*, but in initial districting the aim should be *to come as closely as possible to a one-to-one ratio. There is no showing in this case that the difference of one-third is unavoidable or justified upon any legally acceptable ground.* We must therefore declare Chapter 371 of the Acts of 1965 invalid and forbid its submission in the referendum set for the fall elections of 1966. (Emphasis ours.)

The Maryland three-judge court laid out temporary congressional districts for the 1966 congressional elections.[15] The maximum deviation from an ideal average district under the Maryland court's

14. The Maryland Act declared unconstitutional in *Tawes I* and *Tawes II* involved a factual situation quite comparable to that presented this Court in *Preisler I*. The maximum variance under the Maryland Act was 113,505 in a State with a population of 3,100,689. The maximum variance under the 1961 Missouri Act was 125,251 in a State with a population of 3,418,913. The only real difference in the litigation history of *Preisler I* and *Tawes I* and *II* was that the Attorney General of Maryland "forthrightly declared to the General Assembly [of Maryland] his opinion that the 1965 redistricting measure may have created a disparity too great to be tolerated under the Supreme Court's requirement of equal representation, and urged passage of a new congressional districting plan more closely conforming to the requirements of the Constitution as interpreted by the Supreme Court."

15. In refusing to permit Maryland still further time to comply with the command of Art. I, § 2, that court was influenced, as this Court must be influenced, by the rule applied by the Supreme Court in Swann v. Adams, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707. In that case a three-judge District Court again permitted Florida to conduct elections on an interim basis under a State apportion-

ment plan it had decided was unconstitutional. The Supreme Court reversed, holding "[that] [t]he effect of the District Court's decision is to delay effectuation of a valid apportionment in Florida until at least 1969." The case was remanded to the District Court "so that a valid reapportionment plan will be made effective for the 1966 elections" (383 U.S. at 212, 86 S.Ct. at 768).

The appeal in that case, incidentally, was filed February 1, 1966, and decided by the Supreme Court on February 25, 1966, 383 U.S. 210, 86 S.Ct. 767. It is quite apparent that the Maryland court read an additional message from the speed and terseness with which the Supreme Court affirmed the North Carolina court in *Drum* and reversed the Florida court in *Swann* that, in this election year of 1966, it expected both lower courts and State legislatures to move with more than deliberate speed in regard to reapportionments. See also State of South Carolina v. Katzenbach, 383 U.S. 301 at 307, 86 S.Ct. 803, at 807, 15 L.Ed.2d 769, decided March 7, 1966, in which the Supreme Court noted that it had expedited the hearing of that case involving the Voting Rights Act of 1965 "because of South Carolina's desire to obtain a ruling prior to its primary elections in June 1966."

intĕrim decree was smaller than the minimum deviation of 6,161 accomplished by the 1965 General Assembly of Missouri in its 1965 Act. The Maryland court's smallest deviation was only 80 population, a figure even smaller than the deviations established in the Jackson County and Clay County apportionment cases that pended in this Court.[16]

The appeal from the Maryland three-judge court was docketed in the Supreme Court on May 23, 1966 and on May 31, 1966, under the name of Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed. 2d 586, 1965, the Supreme Court wrote an opinion that was shorter than its opinion in the North Carolina case. It held (34 Law Week 3406):

> The motion to advance is granted. The judgment is affirmed.

It is obvious that we agree with plaintiffs' and intervenors' reading of Wesberry v. Sanders, and that we reject defendants' reading as untenable. We turn briefly to defendants' and intervenors' effort to have us apply the rules of decision stated in Reynolds v. Sims to a case controlled by Wesberry v. Sanders.

### Discussion of Rationale of Congressional Cases Relied Upon by Defendants and Intervenors

Most of the cases involving congressional apportionments have relied solely upon Wesberry v. Sanders. Such cases have made but brief, if any, reference to Reynolds v. Sims. Counsel direct our attention to three federal three-judge congressional cases where the rule of

Reynolds v. Sims was applied rather than the rule of Wesberry v. Sanders. Attention is also directed to several State court cases in which the same thing was done. It is obvious that we do not agree with the rationale of those cases.

Bush v. Martin, S.D.Tex.1966, 251 F. Supp. 484, is relied upon by both the defendants and intervenors. That case, of course, is distinguishable. The 1965 Texas Congressional Redistricting Act was held by a single judge only to be "valid at this time" (251 F.Supp. at 488); "for the time being" (251 F. Supp. at 498); and "for the present" (251 F.Supp. 502). Indeed, Judge Brown stated that "we have * * * emphasized the present" (251 F.Supp. at 515); emphasized that "our approval is limited in duration;" and held that jurisdiction was retained "to enable the 60th Legislature, convening in January of 1967 and any special sessions convened through July 1967, to take further action" (251 F.Supp. at 517).

Judge Ingraham concurred in the result and in the portion of Judge Brown's opinion and the decree that retained jurisdiction "to enable the Texas Legislature * * * to reconsider and revise as necessary" the legislation held valid for the 1966 congressional elections alone.

We respectfully state that we do not agree with the foundation premise upon which the principal opinion of Bush v. Martin, II, is based. That opinion assumed, without any supporting authority, that "the term 'as nearly as is practicable' in *Wesberry* seems to be the

---

16. In Case No. 15745–1 in this Court, Davis et al. v. Curry et al., the reapportionment of the governing body of Jackson County, Missouri, was voluntarily accomplished by creating two representative districts that varied only 792 population from ideal average districts of 330,000 population. The malapportionment corrected was 440,379 in the Western District of Jackson County and 182,361 in its Eastern District.

In No. 15902–2, Wnuk et al. v. Bywaters et al., also in this Court, a similar voluntary reapportionment of Clay County, Missouri, was acomplished with a resultant population deviation of only 166 from an ideal district of 43,237. The malapportionment corrected was 75,787 in Clay County's Western District and 11,-687 in its Eastern District. Experience in those two reapportionment cases, both of which pended in this Court, is convincing evidence that Missouri legislative bodies can discharge their constitutional duty to reapportion in an exemplary manner.

equivalent of the state apportionment aim of 'substantial equality of population' in *Reynolds*" (251 F.Supp. at 497). We do not believe that the less rigid criteria applicable to the abridgment of a citizen's right to vote in a State election under the Equal Protection Clause can thus be made applicable to a case in which plaintiffs' attack is based on a violation of their right to vote in a federal election conferred by Art. I, § 2 of the Constitution. *Drum II*, above discussed, illustrates how a State apportionment with greater variations than a Congressional apportionment may be held to be valid at the same time a Congressional plan must be held to be void under the more strict rule of Art. I, § 2. Bush v. Martin II involved a Congressional, not a State, reapportionment, and the rules of decision applicable to Art. I, § 2, not those applicable to an Equal Protection Clause case, should have been applied. We therefore refuse to follow Bush v. Martin II.[17]

Bush v. Martin II was the only case to which our attention was directed in which a particular court stated the manner in which it extrapolated the rule of decision of Reynolds v. Sims to a congressional districting case. The other three-judge federal cases and the State court cases upon which defendants and intervenors rely simply do just that without any real explanation. What we have said in regard to the basic rationale of Bush v. Martin II is applicable to the other cases.

Again, for the sake of clarity, we state our express disagreement with the rationale of Moore v. Moore, S.D.Ala.1965, 246 F.Supp. 578,[18] and Grills v. Branigin, 255 F.Supp. 155, S.D.Ind., decided February 18, 1966, but not yet reported.

17. We have, of course, heretofore indicated our agreement with Bush v. Martin I. The result reached in this case, in the sense that the 1966 congressional elections will be held under the 1965 Act, is not inconsistent with the result reached in Bush v. Martin II. But the manner in which the not dissimilar results were reached is radically different.

We state our respectful disagreement with the rationale of Bush v. Martin II clearly in the interest of the general administration of federal justice. It has been the practice of this District Court to register its views with candor in order that real conflicts of opinion in the lower federal courts be made apparent on the face of our opinions. See Taylor v. United States, W.D.Mo.1963, 224 F.Supp. 82 at 84, for a relatively recent example of this practice.

In spirit, we believe that our practice reflects the same spirit reflected by Judge John R. Brown in Martin v. Bush II, when he attempted "to make certain that in the inevitable (and healthy) review of this decision the issue of sheer numerical disparity will be posed squarely for the Supreme Court's approval or rejection" (251 F.Supp. at 499). We, and we suspect he, were disappointed to learn that no appeal was taken in Bush v. Martin II. Certainly an appeal in this case will again present that question squarely to the Supreme Court.

18. Moore v. Moore is also clearly distinguishable on the facts. The 1965 Alabama Act's greatest maximum deviations from the ideal average district were only plus 29,788 and minus 24,717, as contrasted with plus 42,913 and minus 41,741 deviations under the 1965 Missouri Act. The real measure of devaluation of a citizen's vote, of course, is more clearly reflected by the population differences between the largest and smallest districts which, in the case of Alabama, was 54,505, as compared to 84,654 under the 1965 Missouri Act. It is pure sophistry to say that such overweighting of votes of particular geographical areas in a State is accurately represented by transposing numbers of citizens into deviations of "only" plus 7.3% and minus 6%, in the case of the 1965 Alabama Act, and plus 9.9% and minus 9.6% in the case of the 1965 Missouri Act. One can well understand why the Supreme Court held in Roman v. Sincock, 377 U.S. 695 at 710, 84 S.Ct. 1449, at 1458, 12 L.Ed.2d 620 (1964), that even in regard to State reapportionments "the problem does not lend itself to * * * uniform formula, and it is neither practicable, nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause."

The factual situation in *Grills*, involving the 1965 Indiana Act, is comparable. The maximum variance between Missouri's smallest and largest districts exceeded that approved by the Indiana three-judge court in that case by only 110 population. Population variances of 84,655 and 84,545, respectively, involving a difference of only 110 population, calls for an application of the *de minimus* doctrine in quite a different way than we believe it should be applied in a congressional districting case. Such variances involve approximately a third of the total votes necessary to elect or defeat a single Congressman. Contrary to the majority opinion in Grills v. Branigin, we do not believe that the statement of such obvious overweighting of the votes of population is made any smaller by stating the facts in terms of percentage figures. We reiterate our disagreement with the majority's opinion in Grills v. Branigin and state that we are in general agreement with the strong dissenting opinion of District Judge Cole J. Holder.[19]

Reynolds v. Sims, itself, at page 580 of 377 U.S., at page 1391 of 84 S.Ct., 12 L.Ed.2d 506, in commenting on the less stringent standards applicable to a State reapportionment case, held that "[c]onsiderations of area alone provide an insufficient justification for deviations from the equal-population principle * * * people, not land or trees or pastures, vote." That case further held that "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation." It added that "[c]itizens, not history or economic interests, cast votes" (377 U.S. at 579–580, 84 S.Ct. at 1391). It is precisely those factors, plus what the defendants call "political stability," that we are urged to approve as legitimate legislative considerations in this case.[20]

We do not know what can be said in *Preisler II* to uphold the constitutionality of the 1965 Missouri Act when all that the Seventy-third General Assembly did in regard to the 1961 Act held constitutionally impermissible in *Preisler I* was to move three small counties from one district to another and to shift a few wards from one district to another in both metropolitan areas. The undisputed and unexplained facts establish that the votes of citizens living in five of the 1965 districts are overweighted and overvalued when the votes of those districts are compared with the weight and value given the votes of the citizens who live in the other five 1965 districts. The differences in population simply will not go away. And, under Art. I, § 2 of the Constitution, population is the sole factor upon which both legislative and judicial judgment must be based.

For the reasons we have stated in detail we find and determine that the 1965 Missouri Congressional Redistricting Act does not comply with the command of Art. I, § 2 of the Constitution of the United States and is therefore constitutionally void.

19. We are, of course, familiar with Kirby v. Illinois State Electoral Board, N.D. Ill.1965, 251 F.Supp. 908. Chief Judge Campbell's opinion does not make clear the legal or factual theories upon which he based his opinion that the "fair compromise between the divergent proposals submitted by the parties" was, under the law and facts, "[a] constitutional reapportionment of Illinois congressional districts" (251 F.Supp. at 910). If that opinion intended to indicate its agreement with the rationale of People ex rel. Scott v. Kerner, 33 Ill.2d 460, 211 N.E.2d 736 (1965), then, for the sake of clarity in defining the areas of conflict, we state that what we have said about Moore v. Moore is applicable to both the Illinois federal and state court cases. The same thing must be said in regard to Levitt v. Maynard, 105 N.H. 447, 202 A.2d 478 (1964), cited and relied upon by the intervenors.

20. See footnote 7 above for defendants' "political stability" argument and their arguments concerning "political", "economic," "historical," and "traditional" factors.

### Remedy

■ Except for the action taken during the pretrial proceedings of this case, the problem of remedy would be indeed troublesome. Under the procedures there established, however, plaintiffs withdrew any attack on the 1965 Act in regard to the 1966 Congressional election. We do not believe that action, taken almost contemporaneously with and without knowledge of Swann v. Adams, supra, footnote 15, should be set aside.

■ We recognize that the Supreme Court indicated in that case in no uncertain terms that, as a general and almost universal rule, the lower federal courts are not permitted to authorize further interim elections under constitutionally void apportionment schemes in cases in which State legislatures have been given full and fair opportunity to act in accordance with constitutional commands. We do not, however, read Swann v. Adams as a direction that district courts are not to exercise their judicial discretion in the formulation of ·an appropriate remedy in a particular apportionment case.

Several factors have caused us to conclude that plaintiffs' decision at pretrial should not be disturbed and that the 1966 congressional elections in Missouri should be held under the districts provided in the 1965 Act.

The next regular session of the General Assembly of Missouri, to be elected after the reapportionment of that body which followed the decision of another three-judge panel of this District Court in Jonas v. Hearnes, W.D.Mo.1964, 236 F.Supp. 699, will convene in January, 1967.[21] History teaches that the State of Missouri accepts the decisions of the Supreme Court of the United States as the supreme law of the Land. See, for example, Cummings v. State of Missouri, 71 U.S. 277, 18 L.Ed. 356 (1866), involving the Test Oath in the 1865 Missouri Constitution, which, for the time being, involved another highly emotional public issue.

Missouri, not unlike her Sister States, sometimes has to be told twice; but *Preisler I* and *Preisler II* will have performed that function. One thing is certain; there will be members of the 1967 Missouri General Assembly who are familiar with the fact Missouri had the painful experience in ' 1932 of electing Congressmen at large after the decision of State ex rel. Carroll v. Becker, Secretary of State, (1932), 329 Mo. 501, 45 S.W.2d 533, affirmed 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807 (1932), on the authority of its companion case, Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), decided the same day.

Missouri was advised in the latter case over thirty years ago that a Missouri General Assembly's failure to reapportion congressional districts in accordance with law required that "unless and until new districts are created, all Representatives allocated to the state must be elected by the state at large" (285 U.S. at 374–375, 52 S.Ct. at 402). Such, of course, is the command of Section 2(a) (c) of Title 2, United States Code, enacted pursuant to Art. I, § 4 of the Constitution of the United States.

■ For the second time, we respectfully direct the attention of the General Assembly of Missouri that will convene in January, 1967 to that legal consequence. It could be, of course, that the 1967 Missouri General Assembly might, in the exercise of its exclusive legislative prerogative, determine that the people of Missouri should elect all their congressmen at large. Power, of course, to make such a decision is constitutionally vested in the Missouri General Assembly. But if the 1967 General Assembly decides that the people of Missouri want their Congressmen elected from districts, that decision must be made in light of and implemented by the enactment of legislation that complies

---

21. On July 8, 1966, the three-judge court sitting in Jonas v. Hearnes formally approved that State apportionment plan submitted in that case.

with the clear commands of both the Constitution of Missouri and the Constitution of the United States.

Primary responsibility for the discharge of that dual constitutional duty rests on the 1967 General Assembly of Missouri. Should it fail for the third time to discharge its constitutional duties, it, and it alone, will be responsible for the inevitable and totally predictable result that will follow: the election of Missouri's ten congressmen at large in the 1968 election and all subsequent congressional elections until some future Missouri General Assembly enacts a constitutional congressional redistricting act.

In order that an immediate appeal may be perfected so that final judgment may be rendered by the Supreme Court before January, 1967, we enter a decree that will permit the 1966 Congressional elections to be held under the present law but in which the 1965 Missouri Congressional Redistricting Act is held to be constitutionally null and void. We shall retain jurisdiction of this case for the purpose of reviewing any new congressional redistricting plan that may be enacted by a future General Assembly of Missouri and signed by the Governor.

If we find that such new legislation is consistent with the constitutional command of Art. I, § 2, this case would then be reopened and our decree will be set aside.

If we should find otherwise, the congressional elections for Missouri will be ordered conducted at large until new and constitutional districts are created.

Pursuant to Rule 56(a) of the Rules of Civil Procedure this opinion shall serve as our findings of fact and conclusions of law.

MATTHES, Circuit Judge (concurring).

Initially, I entertained the view that the 1965 Missouri Congressional Redistricting Act conformed to the mandate of Article 1, § 2 of the Constitution of the United States and Article 3, Section 45 of the Constitution of Missouri. Subsequent deliberation, in light of the teachings of the Supreme Court in the controlling case of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), has compelled me to conclude that the plan is constitutionally unacceptable. Judge Oliver's painstaking analysis of the plan, his demonstration of the wholly unrealistic disparities in the envisioned districts, and his sound exposition of the applicable legal principles should dispel any serious doubt about the matter.

We have emphasized that the responsibility for enacting a constitutionally permissible redistricting plan rests on the Legislature of Missouri. Although the task may be fraught with difficulties, certainly it is not an impossible one. We are convinced that a conscientious effort, motivated by a desire to satisfy the requirements of the federal and State constitutions, will result in the formulation of congressional districts which will comport with the demands of the Constitution of the United States and the Constitution of Missouri.

APPENDIX A

## ILLUSTRATION OF CHANGES MADE BY
## 1965 ACT IN 1961 REDISTRICTING PLAN

This map shows the ten congressional districts of Missouri under the 1965 Act. The 1961 districts may be easily visualized by noting the five changes above circled that were made in the 1961 districts by the 1965 Act:

A. Mercer County (pop. 5,750) shifted from Ninth to Sixth District.

B. Several Kansas City wards (total pop. 27,281) shifted from Fourth to Fifth District.

C. Several St. Louis wards and St. Louis County townships shifted among First, Second, Third and Ninth Districts.

D. Barton County (pop. 11,113) shifted from Seventh to Fourth Districts.

E. Wayne County (pop. 8,638) shifted from the Eighth to the Tenth District.

984

## APPENDIX B

### Plaintiffs' Exhibit No. 4
(From the Official Manual, State of Missouri, 1961–1962; page 1470)

JUDGMENT AND DECREE

PER CURIAM.

This cause having come on for trial, at which all parties, including Intervenors, were present by counsel, and the Court, having considered the pleadings, evidence, and argument of counsel, and being of the view that a decree should be entered in accordance with the opinion of the Court, which also constitutes the Findings of Fact and Conclusions of Law under Rule 52(a) of the Federal Rules of Civil Procedure, and is incorporated herein by this reference, it is therefore ordered, adjudged, and decreed that:

*First:* The 1965 Missouri Congressional Redistricting Act, Section 128.202 to 128.305, constituting Chapter 128 of Title IX of the Missouri Statutes, as amended (September, 1965 Pamphlet, V. A.M.S., pages 76–77) does not comply with Article I, § 2 of the Constitution of the United States. Such Act is therefore unconstitutional and void;

*Second:* Plaintiffs' prayer that defendants be permanently enjoined from performing any and all duties prescribed

by law in connection with the Congressional districts created by the aforesaid Act in and for the primary elections to be held in the years 1968, 1970, and thereafter, should be and is hereby granted.

*Third:* In accordance with plaintiffs' prayer and in the exercise of our judicial discretion, the 1966 congressional elections in Missouri may be held under existing law and shall not be in any way affected by this judgment and decree.

*Fourth:* The Court retains jurisdiction of this cause for such other and further orders as may be appropriate and required.

*Fifth:* This judgment and decree is final; jurisdiction being retained solely for the purpose of enabling the Court to reopen this case on appropriate motion by any party for the purpose of presenting for the Court's future consideration the constitutionality of any subsequently enacted legislation relating to Congressional Redistricting for the State of Missouri that may in the future become the law of Missouri.

It is so ordered.